UNITED STATES of America on the relation of Walter KRUEGER

v.

Nina KINSELLA, Warden of the Federal Reformatory for Women, Alderson, West Virginia.

No. 1726.

United States District Court
S. D. West Virginia.

Jan. 16, 1956.

John C. Morrison, Charleston, W. Va., Frederick Bernays Wiener, Washington, D. C., Adam Richmond, Bethesda, Md., for relator.

Duncan W. Daugherty, U. S. Atty., Huntington, W. Va., Percy H. Brown, Asst. U. S. Atty., Hinton, W. Va., Lt. Colonel James W. Booth, JAGC and Lt. Colonel Cecil L. Forinash, JAGC, Judge

Advocate General's Corps, U. S. Army, for respondent.

MOORE, Chief Judge.

On January 10, 1953, Mrs. Dorothy Krueger Smith was convicted by a United States Army general court-martial, sitting in Tokyo, Japan, of the premeditated murder of her husband, Colonel Aubrey D. Smith. The killing occurred on the night of October 3 or early morning of October 4, 1952, at the quarters occupied by the couple within the area of the Washington Heights Housing Project.

Mrs. Smith was sentenced to imprisonment for life. She appealed through all available military channels, but her conviction and sentence were finally affirmed by the Court of Military Appeals on December 30, 1954. She is now held as a prisoner in the Federal Reformatory for Women, a United States Government Penal Institution located at Alderson, in the Southern Judicial District of West Virginia. Her father, General Walter Krueger, U. S. Army, retired, filed a petition with this Court on December 9, 1955, praying for a writ of habeas corpus on her behalf, and for her release from imprisonment on the ground that the court-martial lacked jurisdiction to try her.

I awarded the preliminary writ, and on December 20, 1955, Mrs. Smith was brought into court at Charleston by the respondent, Nina Kinsella, Warden of the institution where she is confined. The only evidence, aside from the allegations and admissions in the petition and return, were the certified record of the entire proceedings in the military courts and boards, both trial and appellate, and a copy of the petition recently filed in the United States District Court for the District of Columbia in the case of Clarice B. Covert v. Curtis Reid, Superintendent of the District of Columbia jail. Counsel were given unlimited time to present their arguments, as well as time to file further briefs in addition to those submitted prior to the hearing.

It is pertinent to observe here that Brigadier General Onslow S. Rolfe, Commander of Headquarters and Service Command, Far East Command, detailed several officers from other commands to serve on the court-martial, among whom was Major General Joseph P. Sullivan. General Sullivan's service was with the concurrence of his commanding officer, General Mark Clark, Commander in Chief, Far East Command. All the other officers who were to sit on the court-martial were subordinate in rank to General Rolfe.

Mrs. Smith, who was represented at the trial and in all stages of her appeal by Brigadier General Adam Richmond, a retired officer of long legal and military experience, made no objection to the composition of the court-martial before any military court. The challenge is brought forth at this hearing for the first time.

In attacking the jurisdiction of the court-martial, petitioner advances two arguments:

1. That the court was illegally constituted, in that one of the officers who composed it was a Major General, whereas the convening officer was a Brigadier General;

2. That Mrs. Smith, being a civilian, was not subject to the Code of Military Justice, 50 U.S.C.A. § 551 et seq., under the circumstances which prevailed at the time of the alleged offense and at the time of her trial.

The requirements for eligibility to sit as a member of a general court-martial are set out in Article 25 of the Uniform Code of Military Justice, 50 U.S.C.A. § 589, as follows:

"Any officer on active duty with the armed forces shall be eligible to serve on all courts-martial for the trial of any person who may lawfully be brought before such courts for trial."

There is thus no doubt that Major General Sullivan was eligible in the ordinary sense of the word, to serve as a member of a general court-martial. It is argued by counsel for petitioner that "eligibility" necessarily includes inferiority in rank to the convening officer;

and that, since Brigadier General Rolfe, being subordinate in rank to Major General Sullivan, had no authority to order the latter to do anything, he could not therefore make him a member of a general court-martial.

At most, this argument turns on a mere technicality. It is not even pretended that Mrs. Smith suffered any disadvantage, or that her rights were in any way affected by the presence of Major General Sullivan as a member of the court-martial. Actually, General Sullivan was acting under the orders of his superior officer, General Mark Clark. The Manual for Courts-Martial provides for situations of this kind by the following language (see Manual for Courts-Martial, 1951, subparagraph 4f).

"Appointment of members and law officers from other commands of the same armed force.—The convening authority may, with the concurrence of their proper commander, appoint as members of a court-martial * * * eligible persons of the same armed force who are not otherwise under his command. Concurrence of the proper commander may be oral and need not be evidenced by the record of trial".

■ General Rolfe's convening of the court was an administrative, as distinguished from an operational command. In civil affairs, it would be regarded merely as an appointment, and it is so referred to in the above excerpt from the Manual for Courts-Martial. I can find nothing in the Code of Military Justice to indicate that in performing such a function distinctions of rank are important. Possibly General Sullivan might have had grounds based on seniority of rank for declining to sit on the court; possibly Mrs. Smith might have objected at the time to his sitting; but he having willingly acceded to the convening order, and she not having objected at any time to his sitting as a member of the court-martial, I hold that the objection to General Sullivan as a member of the court-martial, if there was a substantial objection, has been waived, and

cannot now be raised. The applicable rule of decision is found in the case of Swaim v. United States, 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823, rather than in McClaughry v. Deming, 186 U.S. 49, 22 S.Ct. 786, 46 L.Ed. 1049, relied on by petitioner.

Having concluded that the technical or procedural objection to the jurisdiction of the court-martial is without merit, I am forced to consider the constitutional question raised by the petitioner.

Counsel for petitioner very frankly says that the present effort to procure Mrs. Smith's release on this writ of habeas corpus stems from the recent decision of the United States Supreme Court in the case of United States of America ex rel. Toth v. Quarles, 1955, 350 U.S. 11, 76 S.Ct. 1, followed by the action of the District Court of the District of Columbia in freeing Mrs. Clarice Covert in circumstances very similar to those which surround Mrs. Smith. The Covert case has not yet been reported.

I think the Toth case is readily distinguishable. Toth was a civilian residing in the continental United States, who, at the time charges were made against him, had no connection with the armed forces. The decision in that case turned on the right of Toth to claim the protection of those Constitutional guaranties which secure to persons accused of crime in this country, except those who are in the land or naval forces, the traditional safeguards which accompany every criminal trial in the civil courts. Chief among these are the right to have the charge, if a felony, presented to a grand jury, the right to trial by jury, and to have these rights passed on by courts whose judges are a part of our Constitutional system of civil courts. Not all of these safeguards are or can be provided in a trial by court-martial.

In the Covert case the status of the petitioner was that of a person who, having been charged and convicted by a United States Army court-martial in a foreign land, was now within the borders of the United States, her conviction

reversed, and she, no longer a follower of the army, merely awaiting trial on the original charge. Judge Tamm thought that under these circumstances the principle announced in the Toth case obliged him to grant her freedom pursuant to the writ of habeas corpus. I do not think it necessary, because of the different circumstances in the case before me, either to adopt or reject his reasoning.

Mrs. Smith's situation differed from that of Toth in at least two significant respects:

(1) She was not living in the United States, nor present there when she was charged with the murder of her husband;

(2) She was connected with the army as a person "accompanying the armed forces without the continental limits of the United States"; both when she committed the act and when she was arrested and tried for it.

It may be useful at this point to examine the sections of Article 2 of the Code of Military Justice, "Title 50, U.S. C.A., § 552," which specify the conditions under which persons accompanying the armed forces may be tried by court-martial.

The pertinent sections of Article 2 read as follows:

"The following persons are subject to this chapter:

\*     \*     \*     \*     \*

"(10) In time of war, all persons serving with or accompanying an armed force in the field;

"(11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States
\*   \*   \*."

It is to be observed that Article 2(10) gives unlimited court-martial jurisdiction over followers of the army in time of war and in the field. While it is not argued by counsel for petitioner that Ar-ticle 2(10) in any way exceeds the Constitutional power of Congress, it is proper, I think, to point out the distinctions drawn by Congress itself between Article 2(10) and Article 2(11).

The reason for such a broad grant of court-martial jurisdiction in time of war is obvious. It is essential that the operations of an army in the field be unobstructed by the acts of any person, whatever his status. Even if the Constitution were silent on the subject, military commanders in the field of war would nevertheless have the usual and necessary court-martial powers by virtue of the law of war itself. Congress having been granted in the Constitution, art. 1, § 8, the powers to "declare War" and to "raise and support Armies," as well as to "make Rules for the Government and Regulation of the land and naval Forces", the last mentioned power, insofar as it is to operate in time of war, is referable to the others, and is co-extensive in scope with the law of war under which court-martial jurisdiction is permitted over certain classes of civilians. Madsen v. Kinsella, 1952, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988.

Article 2(11) is not limited to a time of war or to the field of action. It purports to extend the coverage of the Code of Military Justice (and hence the jurisdiction of courts-martial) to all persons "accompanying the armed forces" abroad. This coverage, however, is conditional. If some accepted rule of international law or the terms of some treaty or agreement to which the United States is a party are applicable to a particular case, then by its own limitations Article 2(11) does not come into play.

Now, it is a well recognized maxim of the law of nations that a citizen of one country who commits a local crime in another country is amenable to the laws of the latter. In the absence of a treaty he is entitled to claim no extra-territorial rights. If he believes himself to have been unfairly dealt with, his only recourse is through diplomatic

channels. From this maxim flows the principle, recognized by the Supreme Court in the case of In re Ross, 1891, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 and never repudiated in any case that I have found, that the United States Constitution gives no protection to persons accused of committing local crimes in foreign countries.

Counsel for petitioner, in his brief and in argument, has cited several cases from which he argues that the doctrine that the Constitution does not "follow the flag" is outmoded, and is not now the law. United States v. Flores, 1933, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086; Blackmer v. United States, 1932, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375; United States v. Bowman, 1922, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149; Jones v. United States, 1890, 137 U.S. 202, 11 S. Ct. 80, 34 L.Ed. 691; Best v. United States, 1 Cir., 1950, 184 F.2d 131. On examination of these cases it is found that in every instance the crime involved was one denounced by some statute of the United States, and triable in some one of our District Courts. In no instance has it been even contended that a person accused of a purely local crime in a foreign country may claim any of the procedural rights guaranteed in the Constitution of the United States.

It is plain, therefore, that the rule of United States ex rel. Toth v. Quarles does not apply here. Still, as I have indicated, it is not enough to find that the provisions of our Bill of Rights and other prohibitory sections of our Constitution did not stand between Mrs. Smith and her trial by court-martial. If the jurisdiction is to be sustained, we must go farther, and discover in that instrument an affirmative grant of Congressional power, either expressly or by necessary implication.

It is in evidence that in the year 1952 the newly re-organized Government of Japan entered into a treaty with the United States, which was duly ratified by the Senate. By an administrative agreement implementing that treaty, the Japanese Government ceded to the United States, through its military courts and authorities, all jurisdiction to try offenses committed in Japan by dependents of members of the armed forces, excluding those of Japanese nationality. Had this treaty been in effect at the time Article 2(11) of the Code of Military Justice was enacted, it might be cited as the source of Congressional power to pass this act; but it would scarcely be contended, I think, that a piece of legislation, if it were void for lack of constitutional authority when passed, could be validated by a later treaty, even though Congress might subsequently act freely in that field. However, the treaty did remove the limitations which in its absence would have prevented Article 2(11) from taking effect, in that upon the ratification of the treaty there was no longer any "accepted rule of international law" or any treaty to the contrary which interfered with its operation.

I am driven to the conclusion that Constitutional authority for subjecting civilians accompanying the armed forces to court-martial discipline in time of peace, if such exists, must be found in Article 1, Section 8 of the Constitution, by one of the clauses of which section the power is bestowed on Congress "To make rules for the Government and Regulation of the land and naval Forces", as supplemented by the "necessary and proper" clause.

■■ Courts are slow to reject as unconstitutional a law which has been duly passed by Congress. Congressmen as well as Judges take an oath to support the Constitution of the United States. It is not probable that in any session of that body there should be a dearth of members who are themselves expert in the field of Constitutional law. It is not to be lightly supposed, therefore, that Congress would enact such an important bit of legislation as that which we have under consideration without a careful inquiry into the scope of its own Constitutional power. True it is that if a law of Congress clearly trans-

gresses some positive prohibition expressed in the Constitution it is the duty of a court to strike it down; but where, as here, the problem is merely to find authority for an act which is not forbidden by that instrument, we must proceed more cautiously. In view of the "necessary and proper" clause, we must weigh in the scales in favor of the law's validity every circumstance which may be reasonably assumed to have influenced its enactment. As was said by Chief Justice Marshall in the celebrated case of McCulloch v. State of Maryland, 1819, 4 Wheat. 316, 4 L.Ed. 579:

> "We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional * * * where the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground."

Since the end of World War II segments of the armed forces of the United States have been stationed in many nations throughout the world. In the interest of keeping the morale of the troops on a high level, the government has encouraged the wives of soldiers to accompany them and live with them at their various posts, and has expended vast sums of money in transportation and maintenance charges for that purpose. It was said in argument and not disputed that there are now no fewer than a quarter of a million civilians of all descriptions accompanying the armed forces without the continental limits of the United States and the territories mentioned in Article 2(11) of the Code of Military Justice. In the existing circumstances, if these civilians are to be exempt from discipline by the military forces in the only available way, namely, by court-martial procedure, a most serious situation is presented. They must then either be subject in all respects to the local laws of the countries where they are stationed, or else they are left free from all restraints whatsoever.

Though I reject the contention of counsel for respondent that a civilian in Mrs. Smith's situation is "part" of the armed forces, nevertheless I cannot say with certainty that the power of Congress to provide for court-martial discipline of these civilians accompanying the armed forces abroad is not necessarily and properly incident to the express power "To make Rules for the Government and Regulation of the land and naval Forces". Neither the Toth case nor any other expression by the Supreme Court compels such a conclusion. Therefore, I must uphold Article 2(11) of the Code of Military Justice in its entirety.

The writ of habeas corpus will be discharged.