KINSELLA, WARDEN, *v.* KRUEGER.

No. 713.   Argued May 3, 1956.—Decided June 11, 1956.

*Marvin E. Frankel* argued the cause for petitioner. With him on the brief were *Solicitor General Soberloff, Assistant Attorney General Olney, Beatrice Rosenberg* and *Richard J. Blanchard.*

*Frederick Bernays Wiener* argued the cause for respondent.   With him on the brief was *Adam Richmond.*

Mr. Justice Clark delivered the opinion of the Court.

Congress, in Article 2 (11) of the Uniform Code of Military Justice, has provided that all persons "accompanying the armed forces without the continental limits of the United States" and certain named territories shall be subject to the Code if such jurisdiction is authorized under "any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law." 50 U. S. C. § 552. Pursuant to this article and a subsequent agreement between the United States and Japan,[1] Mrs. Dorothy Krueger Smith was tried by a gen-

---

[1] Relevant portions of the administrative agreement are:

*"Article IX*

"1. The United States shall have the right to bring into Japan for purposes of this Agreement persons who are members of the United States armed forces, the civilian component, and their dependents.

.          .          .          .          .

*"Article XVII*

"1. Upon the coming into force with respect to the United States of the 'Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces', signed at London on June 19, 1951, the United States will immediately conclude with Japan, at the option of Japan, an agreement on criminal jurisdiction similar to the corresponding provisions of that Agreement.

"2. Pending the coming into force with respect to the United States of the North Atlantic Treaty Agreement referred to in paragraph 1, the United States service courts and authorities shall have the right to exercise within Japan exclusive jurisdiction over all offenses which may be committed in Japan by members of the United States armed forces, the civilian component, and their dependents, excluding their dependents who have only Japanese nationality. Such jurisdiction may in any case be waived by the United States.

.          .          .          .          .

"4. The United States undertakes that the United States service courts and authorities shall be willing and able to try and, on conviction, to punish all offenses against the laws of Japan which members of the United States armed forces, civilian component,

eral court-martial in Tokyo, Japan, for the premeditated murder of her husband, a colonel in the United States Army. She was found guilty and sentenced to life imprisonment. 10 C. M. R. 350. Her conviction was affirmed by the Board of Review, 17 C. M. R. 314, and the Court of Military Appeals, 5 U. S. C. M. A. 314, and she began serving her sentence in the Federal Reformatory for Women, Alderson, West Virginia.

Thereafter, a petition for a writ of habeas corpus was filed on Mrs. Smith's behalf by her father, respondent herein. The petition alleged that the court-martial had no jurisdiction to try Mrs. Smith because Article 2 (11) of the Uniform Code of Military Justice violates both Art. III, § 2, and Amendment VI of the Federal Constitution, which guarantee the right to trial by jury to a civilian. The United States District Court for the

and their dependents may be alleged on sufficient evidence to have committed in Japan, and to investigate and deal appropriately with any alleged offense committed by members of the United States armed forces, the civilian component, and their dependents, which may be brought to their notice by Japanese authorities or which they may find to have taken place. The United States further undertakes to notify the Japanese authorities of the disposition made by United States service courts of all cases arising under this paragraph. The United States shall give sympathetic consideration to a request from Japanese authorities for a waiver of its jurisdiction in cases arising under this paragraph where the Japanese Government considers such waiver to be of particular importance. Upon such waiver, Japan may exercise its own jurisdiction.

"5. In the event the option referred to in paragraph 1 is not exercised by Japan, the jurisdiction provided for in paragraph 2 and the following paragraphs shall continue in effect. In the event the said North Atlantic Treaty Agreement has not come into effect within one year from the effective date of this Agreement, the United States will, at the request of the Japanese government, reconsider the subject of jurisdiction over offenses committed in Japan by members of the United States armed forces, the civilian component, and their dependents." 3 UST (Part 3) 3346, 3353–3356.

Southern District of West Virginia issued a preliminary writ. After a hearing, which included the submission of briefs and unlimited oral argument, the writ was discharged and Mrs. Smith was remanded to the custody of the Warden. 137 F. Supp. 806. In order to expedite the determination of the case, the Government itself sought certiorari while an appeal was pending before the Court of Appeals for the Fourth Circuit. We granted review on March 12, 1956, 350 U. S. 986, because of the serious constitutional question presented and its far-reaching importance to our Armed Forces stationed in some sixty-three different countries throughout the world. We agree with the decision of the District Court.

In its entirety, Art. 2 (11), 50 U. S. C. § 552, provides that:

> "The following persons are subject to this chapter:
>
> .    .    .    .    .
>
> "(11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States and without the following territories: That part of Alaska east of longitude one hundred and seventy-two degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands . . . ."

Mrs. Smith comes squarely within the terms of this provision. As a military dependent, she had accompanied her husband beyond the continental limits of the United States. Prior to her husband's death they lived together in Washington Heights, an American community in Tokyo composed exclusively of American servicemen and their dependents. Japan, at the time of the offense, had ceded to the United States "exclusive jurisdiction over all

offenses which may be committed in Japan by members of the United States armed forces, the civilian component, and their dependents . . . ." Art. XVII, 3 UST (Part 3) 3354. Since Article 2 (11) concededly applies to this case if it was within the power of Congress to enact, the constitutionality of that provision is the sole question presented. Essentially, we are to determine only whether the civilian dependent of an American serviceman authorized to accompany him on foreign duty may constitutionally be tried by an American military court-martial in a foreign country for an offense committed in that country.

Trials by court-martial are governed by the Uniform Code of Military Justice, 64 Stat. 109, 50 U. S. C. § 551 *et seq.* The Code was carefully drawn by Congress to include the fundamental guarantees of due process, and in operation it has provided a fair and enlightened system of justice. However, courts-martial are not required to provide all the protections of constitutional courts; therefore, to try by court-martial a civilian entitled to trial in an Article III court is a violation of the Constitution. *Toth* v. *Quarles,* 350 U. S. 11. Accordingly, our first inquiry is directed to the question whether, as a matter of constitutional right, an American citizen outside of the continental limits of the United States and in a foreign country is entitled to trial before an Article III court for an offense committed in that country.

In making this determination, we are not faced with the question "whether the Constitution is operative, for that is self-evident, but whether the provision relied on is applicable." [2] Entirely aside from the power of Con-

---

[2] Mr. Justice White concurring in *Downes* v. *Bidwell,* 182 U. S. 244, 292. See *Dorr* v. *United States,* 195 U. S. 138. "The *Dorr Case* shows that the opinion of Mr. Justice White of the majority, in *Downes* v. *Bidwell,* has become the settled law of the court." Taft, C. J., in *Balzac* v. *Porto Rico,* 258 U. S. 298, 305.

gress under Article III of the Constitution, it has been well-established since Chief Justice Marshall's opinion in *American Insurance Co.* v. *Canter,* 1 Pet. 511, that Congress may establish legislative courts outside the territorial limits of the United States proper. The procedure in such tribunals need not comply with the standards prescribed by the Constitution for Article III courts. In cases arising from Hawaii,[3] the Philippines,[4] and Puerto Rico,[5] this Court has recognized the power of Congress to enact a system of laws which did not provide for trial by jury. By 1922 it was regarded as "clearly settled" that the jury provisions of Article III and the Sixth and Seventh Amendments "do not apply to territory belonging to the United States which has not been incorporated into the Union." *Balzac* v. *Porto Rico,* 258 U. S. 298, 304–305.

In an earlier case, this Court had sustained the constitutionality of an Act of Congress which created consular courts to try, pursuant to treaties, American citizens for crimes committed in Japan, China, and other countries. *In re Ross,* 140 U. S. 453. Ross, an American seaman convicted of murder by a consular court in Yokohama, Japan, contended that he had been deprived of his constitutional right to both grand and petit juries. In rejecting this claim, the Court pointed out that these constitutional guarantees were not applicable to a consular court sitting outside the continental United States. 140 U. S., at 464. Recounting the long-established practice of governments to provide "for the exercise of judicial authority in other countries by [their] officers appointed to reside therein," *id.,* at 463, the Court noted that the requirement of a grand and petit jury in these circumstances "would defeat the main purpose of investing the

---

[3] *Hawaii* v. *Mankichi,* 190 U. S. 197.

[4] *Dorr* v. *United States,* 195 U. S. 138.

[5] *Balzac* v. *Porto Rico,* 258 U. S. 298.

consul with judicial authority." 140 U. S., at 465. In 1929, citing *Ross* with approval in *Ex parte Bakelite Corp.*, 279 U. S. 438, 451, this Court reaffirmed the doctrine that "legislative courts . . . exercise their functions within particular districts in foreign territory and are invested with a large measure of jurisdiction over American citizens in those districts. The authority of Congress to create them and to clothe them with such jurisdiction has been upheld by this Court and is well recognized." These cases establish beyond question that the Constitution does not require trial before an Article III court in a foreign country for offenses committed there by an American citizen and that Congress may establish legislative courts for this purpose.

Having determined that one in the circumstances of Mrs. Smith may be tried before a legislative court established by Congress,[6] we have no need to examine the power of Congress "To make Rules for the Government and Regulation of the land and naval Forces" under Article I of the Constitution. If it is reasonable and consonant with due process for Congress to employ the existing system of courts-martial for this purpose, the enactment must be sustained.

In the present day, we, as a Nation, have found it necessary to the preservation of our security to maintain American forces in some sixty-three foreign countries. The practical necessity of allowing these men to be

---

[6] In this respect this case is entirely different from *Toth* v. *Quarles*, *supra*, where the defendant, after discharge from military service and return to this country, was entitled to trial before an Article III court, and we found "no excuse for new expansion of court-martial jurisdiction at the expense of the normal and constitutionally preferable system of trial by jury." 350 U. S., at 22–23. In *Toth* we found that Article 3 (a) of the Uniform Code of Military Justice "necessarily encroaches on the jurisdiction of federal courts set up under Article III of the Constitution." 350 U. S., at 15. No like constitutional bar exists in the present case.

accompanied by their families where possible has been recognized by Congress as well as the services, and the result has been the creation of American communities of mixed civilian and military population at bases throughout the world. In all matters of substance, the lives of military and civilian personnel alike are geared to the local military organization which provides their living accommodations, medical facilities and transportation from and to the United States. We could not find it unreasonable for Congress to conclude that all should be governed by the same legal standard to the end that they receive equal treatment under law. The effect of a double standard might well create sufficient unrest and confusion to result in the destruction of effective law enforcement.[7] By the enactment of Article 2 (11) of the Code, Congress has provided that all shall be subject to the same system of justice and that the military commander who bears full responsibility for the care and safety of those civilians attached to his command shall also have authority to regulate their conduct.

It was conceded before this Court that Congress could have established, or might yet establish, a system of territorial or consular courts to try offenses committed by

---

[7] One need only consider the disruptive effect of establishing another type of legislative court to deal with the same offenses in the same territorial jurisdiction as the military tribunals. In cases of conspiracy or joint crime, parallel trials would have to be held in separate courts. Since the trials could not proceed at the same time, one would of necessity precede and influence the other, and results could understandably be disparate. Nor is the problem of insignificant proportions. Reliable figures show that our Armed Forces overseas are accompanied by approximately a quarter of a million dependents and civilian workers. Figures relating to the Army alone show that in the 6 fiscal years from July 1, 1949, to June 30, 1955, a total of 2,280 civilians were tried by courts-martial. While it is true that the vast majority of these prosecutions were for minor offenses, the volume alone shows the serious problem that would be presented by the administration of a dual system of courts.

civilian dependents abroad. While this would be within the power of Congress, *In re Ross, supra,* clearly nothing in the Constitution compels it. The power to create a territorial or consular court does not preclude, but must necessarily include, the power to provide for trial before a military tribunal unless that alternative is "so clearly arbitrary or capricious that legislators acting reasonably could not have believed it necessary or appropriate for the public welfare." [8]   The choice among different types of legislative tribunals is peculiarly within the power of Congress, *Ex parte Bakelite Corp.,* 279 U. S. 438, 451, and we are concerned only with the constitutionality, not the wisdom, of this choice.

In selecting the Uniform Code of Military Justice, Congress might have sought to avoid needless and potentially harmful duplication of a legal system already extant in every foreign nation where our troops are stationed. On the other hand, Congress could well have determined that the Code was adequate to the purpose to be achieved and would afford more safeguards to an accused than any other available procedure. The Code is a uniform system of legal procedure, applicable beyond any constitutional question to all servicemen stationed abroad. It was adopted by Congress only after an exhaustive study of several years duration and the consultation of acknowledged authorities in the fields of constitutional and military law.[9]   In addition to the fundamentals of due process, it includes protections which this Court has not required a State to provide [10] and some procedures which would

---

[8] Mr. Justice Brandeis dissenting in *Burns Baking Co.* v. *Bryan,* 264 U. S. 504, 534.

[9] See Hearings Before a Subcommittee of the Committee on Armed Services, House of Representatives, 81st Cong., 1st Sess. (1949).

[10] *E. g.,* self-incrimination, compare Art. 31 and ¶149b, and ¶72b, Manual for Courts-Martial, with *Adamson* v. *California,* 332 U. S. 46; former jeopardy, compare Arts. 44 and 63 with *Palko* v. *Con-*

compare favorably with the most advanced criminal codes. We find no constitutional defect in the fact that the Code does not provide for indictment by grand jury or trial by petit jury. In these respects it does not differ from the procedures specifically approved by this Court in other types of legislative courts established abroad by Congress. *In re Ross, supra; Hawaii* v. *Mankichi,* 190 U. S. 197; *Dorr* v. *United States,* 195 U. S. 138; *Balzac* v. *Porto Rico, supra.*

Furthermore, since under the principles of international law each nation has jurisdiction of the offenses committed within its own territory, *Schooner Exchange* v. *McFaddon,* 7 Cranch 116, 136, the essential choice involved here is between an American and a foreign trial. Foreign nations have relinquished jurisdiction to American military authorities only pursuant to carefully drawn agreements which presuppose prompt trial by existent authority.[11]  Absent the effective exercise of jurisdiction thus obtained, there is no reason to suppose that the nations involved would not exercise their sovereign right to try and punish for offenses committed within their borders. Under these circumstances, Congress may well have determined that trial before an American court-martial in which the fundamentals of due process are assured was preferable to leaving American servicemen and their dependents throughout the world subject to widely varying standards of justice unfamiliar to our people.[12]

---

*necticut,* 302 U. S. 319; use of illegally obtained evidence, compare ¶152, Manual for Courts-Martial, with *Wolf* v. *Colorado,* 338 U. S. 25.

[11] See note 1, *supra,* and Schwartz, International Law and the NATO Status of Forces Agreement, 53 Col. L. Rev. 1091; Re, The NATO Status of Forces Agreement and International Law, 50 N. W. U. L. Rev. 349.

[12] It has been suggested that bringing American citizens to this country for trial for offenses committed abroad may be a preferable solution even if it is not required by the Constitution. Congress

We note that this case presents no problem of the jurisdiction of a military court-martial sitting within the territorial limits of the United States or the power of Congress to provide for trial of Americans sojourning, touring, or temporarily residing abroad. No question of the legal relation between treaties and the Constitution is presented. On the question before us, we find no constitutional bar to the power of Congress to enact Article 2 (11) of the Uniform Code of Military Justice.

The judgment is

*Affirmed.*

---

might well have concluded that this suggestion was completely impractical. First, a condition precedent to trial in this country would be the consent of the foreign nation concerned in each individual case. This consent could always be withheld and it is likely that foreign nations would refuse to cede jurisdiction over serious offenses when trial might be held many thousands of miles away. Even where jurisdiction was obtained, the deterrent effect of such prosecutions might well be vitiated by the distance and delay involved. Secondly, both the Government and the accused would face serious problems in the production of witnesses. Depositions for the Government are not permitted in criminal cases. See Rule 15, Federal Rules of Criminal Procedure. Attendance of foreign witnesses could be only on a voluntary basis and the testimony of no foreign witness could be compelled if the witness or his government refused. The expense of transporting witnesses would be considerable for the Government and probably impossible for a defendant, whose successful defense may depend on the demeanor of one witness. In fairness, the Government would have to bear the expense of transporting the defendant's witnesses as well as its own, and the possibilities of abuse are obvious.

Finally, a breakdown of the figures on trial by courts-martial of civilians abroad from 1950–1955 shows that some 2,000 of the 2,280 cases tried involved offenses for which the maximum punishment was six months or less. The Government might be unwilling to undergo the heavy expense and inconvenience of trial here for such minor offenses. The alternatives would be either trial by the foreign country or no trial at all; the result must be the practical abdication of American judicial authority, precisely what Congress wished to avoid.

Reservation of MR. JUSTICE FRANKFURTER.†

The Court today sustains Mrs. Clarice B. Covert's conviction by a general court-martial in England for the murder of her husband, a sergeant in the United States Air Force, and the conviction of Mrs. Dorothy Krueger Smith by a general court-martial in Japan for the murder of her husband, a colonel in the United States Army. The Court does so, although it announces that "we have no need to examine the power of Congress 'To make Rules for the Government and Regulation of the land and naval Forces' under Article I of the Constitution." The plain inference from this is that the Court is not prepared to support the constitutional basis upon which the Covert and Smith courts-martial were instituted and the convictions were secured.

The Uniform Code of Military Justice which governed these proceedings, and the international arrangements with England and Japan whereby the United States was allowed to exercise jurisdiction over the alleged crimes, are concerned with, directed toward, and explicitly acknowledged as legal measures that had their source in, and were obviously to be an exercise of, the constitutional power of Congress "To make Rules for the Government and Regulation of the land and naval Forces." As provided by the Uniform Code of Military Justice, Mrs. Smith and Mrs. Covert were tried as though they were members of the Armed Forces. In view of this Court's opinion in *Toth* v. *Quarles,* 350 U. S. 11, and the fact that the Constitution "clearly distinguishes the military from the civil class as separate communities" and "recognizes no third class which is part civil and part military—military for a particular purpose or in a particular

†[NOTE: This reservation applies also to *Reid* v. *Covert, post,* p. 487.]

situation, and civil for all other purposes and in all other situations . . . ," Winthrop, Military Law and Precedents (2d ed. 1896), 145, the Court's failure to rest its decision upon the congressional power "To make Rules for the Government and Regulation of the land and naval Forces" is significant.

Having put out of consideration reliance on the immediately pertinent constitutional provision bearing on the difficulties raised by these cases, the Court sustains the convictions by two lines of argument that obviously have nothing whatever to do with the regulation of the Armed Forces of the United States. The Court relies on *In re Ross,* 140 U. S. 453, a case that represents, historically and juridically, an episode of the dead past about as unrelated to the world of today as the one-hoss shay is to the latest jet airplane. In complete disregard of the political and legal sources purporting to render women like Mrs. Smith and Mrs. Covert amenable to military courts-martial for crimes committed abroad, the Court draws on the system of capitulations whereby Western countries, including the United States, compelled powerless Eastern and Asiatic nations to surrender their authority over conduct within their confines by citizens of these Western nations to the rule of Western "consular courts." The Eastern nations were made to yield because "of the barbarous and cruel punishments inflicted in those countries, and the frequent use of torture to enforce confession from parties accused . . . ." *In re Ross, supra,* at 463. I do not suppose that the arrangements by which Great Britain and Japan gave the United States jurisdiction over the murders with which Mrs. Smith and Mrs. Covert were charged are to be deemed concessions wrung by the United States as were the capitulations wrung, often by force, from the Ottoman Empire and other

Eastern nations because they were deemed inferior by the West, long ago and far away.*

The Court derives its second line of argument from the decisions of this Court which have evolved the power of Congress to deal with territory acquired by purchase or through war, beginning with the statute of 1822, which set up the government of Florida. See *American Insurance Co.* v. *Canter,* 1 Pet. 511. I must confess inability to appreciate the bearing of the series of complicated adjudications dealing with the difficult problems relating to "organized" and "unorganized" territories of the United States to legislation by Congress treating civilians accompanying members of the Armed Forces abroad as though they were part of the Armed Forces and therefore amenable to the Code of Military Justice.

Grave issues affecting the status of American civilians throughout the world are raised by these cases; they are made graver by the arguments on which the Court finds it necessary to rely in reaching its result. Doubtless because of the pressure under which the Court works during its closing weeks, these arguments have been merely adumbrated in its opinion. To deal adequately with them, however, demands of those to whom they are not persuasive more time than has been available to exam-

---

*See the opinion, in 1855, of Attorney General Caleb Cushing: "The legal rationale of the treaty stipulations as to China, with which we are now chiefly concerned, and their relation to the legislative authority of the United States, are explained in a dispatch of the Minister who negotiated the treaty, as follows:

"'I entered China with the formed *general* conviction that the United States ought not to concede to any foreign state, under any circumstances, jurisdiction over the life and liberty of a citizen of the United States, unless that foreign state be of our own family of nations,—in a word, a Christian state. . . .'" 7 Op. Atty. Gen. 495, 496–497.

ine and to analyze in detail the historical underpinning and implication of the cases relied upon by the Court, as a preliminary to a searching critique of their relevance to the problems now before the Court. For the moment, it must suffice, by way of example, to indicate that by resorting to *In re Ross* the Court has torn from its historical context an institution—the consular court—that had a totally different source and a totally different purpose than the source and purpose of Art. 2 (11) of the Uniform Code of Military Justice, 64 Stat. 107, 109. A glimpse into the international environment and political assumptions out of which the consular court system derived and of which it was a part suffices to indicate the scope of the inquiry for which the Court's opinion calls. Such a glimpse is afforded by the justification for consular courts urged by the Government on this Court 65 years ago. Reliance was placed on this authoritative view of Secretary of State Hamilton Fish:

> "A report made to Congress by my predecessor, Mr. Seward . . . shows that it has been the habit of this Department to regard the judicial power of our consular officers in Japan as resting upon the assent of the Government of that kingdom, whether expressed by formal convention or by tacit acquiescence in the notorious practice of the consular courts. In other words, they were esteemed somewhat in the same light as they would have been if they were constituted by the Mikado with American citizens as judges, and with all the authority with which a Japanese tribunal is invested in respect to the native subjects of Japan, to the extent that our Government will admit a jurisdiction understood to be extremely arbitrary. They were, so to speak, the agents of a depotism [*sic*], only restrained by such safeguards as

our own Government may interpose for the protection of citizens who come within its sway." Brief for the United States, p. 25, in *In re Ross*, 140 U. S. 453.

Time is required not only for the primary task of analyzing in detail the materials on which the Court relies. It is equally required for adequate reflection upon the meaning of these materials and their bearing on the issues now before the Court. Reflection is a slow process. Wisdom, like good wine, requires maturing.

Moreover, the judgments of this Court are collective judgments. They are neither solo performances nor debates between two sides, each of which has its mind quickly made up and then closed. The judgments of this Court presuppose full consideration and reconsideration by all of the reasoned views of each. Without adequate study there cannot be adequate reflection. Without adequate reflection there cannot be adequate deliberation and discussion. And without these, there cannot be that full interchange of minds which is indispensable to wise decision and its persuasive formulation.

The circumstances being what they are, I am forced, deeply as I regret it, to reserve for a later date an expression of my views.

Mr. Chief Justice Warren, Mr. Justice Black, and Mr. Justice Douglas dissent.*

The decisions just announced have far-reaching importance. They subject to military court-martial, even in time of peace, the wives, mothers and children of members of the Armed Forces serving abroad even though these dependents have no connection whatever with the Armed Forces except their kinship to military personnel and their presence abroad. The questions raised are complex, the

---

*[Note: This dissent applies also to *Reid* v. *Covert, post,* p. 487.]

remedy drastic, and the consequences far-reaching upon the lives of civilians. The military is given new powers not hitherto thought consistent with our scheme of government.

For these reasons, we need more time than is available in these closing days of the Term in which to write our dissenting views. We will file our dissents during the next Term of Court.