**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

**v.**

**Lyon Tyler MATTHEW et al., Respondents.**

**No. 20796.**

United States Court of Appeals
Fifth Circuit.
July 28, 1964.
Rehearing Denied Oct. 19, 1964.

Crane C. Hauser, Chief Counsel, Charles S. Casazza, Atty., I. R. S., Louis F. Oberdorfer, Asst. Atty. Gen., John B. Jones, Jr., Acting Asst. Atty. Gen., Meyer Rothwacks, Lee A. Jackson, David O. Walter, Benjamin M. Parker, William A. Geoghagan, Attys., Dept. of Justice, Washington, D. C., for petitioner.

Lucius A. Buck, Horace R. Drew, Jr., Theodore W. Glocker, Jr., Jacksonville, Fla., for respondents.

Before TUTTLE, Chief Judge, BROWN, Circuit Judge, and BREWSTER, District Judge.

JOHN N. BROWN, Circuit Judge.

The question in this case is whether each of the three Taxpayers was a "bona fide resident of a foreign country or countries," 26 U.S.C.A. § 911(a) (1), during the pertinent tax years running from 1956 through 1958. The Tax Court held that each was. 38 T.C. 417. We disagree and reverse.

Taxpayers [1] during the years concerned were employees of Pan Am [2] at various United States Auxiliary Air Force Bases situated on British Islands in the Atlantic Ocean. [3] Pan Am, under a yearly contract, was a civilian contractor of the United States Air Force Missile Test Center at Patrick Air Force Base, some 18 miles from Cape Kennedy, Florida, the Atlantic Long Range Guided Missile launching station. These operations, now eclipsed by the spectacular orbital launchings of manned spacecraft from the Cape, were part of the post-World War II legislation to develop and test military missiles. [4] Construction at Down-Range Missile Tracking Stations began early in 1951. For all practical purposes, the operation and management of these down-range tracking stations,

1. In our approach to the case, the evidentiary details as to each individual are unimportant. Consequently, we refer indiscriminately to them as Taxpayer or Taxpayers.

2. Pan American World Airways, Inc.

3. The Islands were Grand Bahama, San Salvador, Mayaguana and Ascension.

These Bases were established pursuant to treaties between the United States and the United Kingdom in 1950 and 1956.

4. In May 1950, the Joint Long-Range Proving Ground became the sole responsibility of the Air Force. The first missile was launched on July 24, 1950,

though nominally commanded by an Air Force officer, were committed to Pan Am through its civilian employees.

The Government attacks the Tax Court decision primarily on the ground that the nature of this employment at remote, sometimes almost uninhabited or uninhabitable islands, demonstrated that apart from this governmentally initiated, controlled, and operated military project, none of the Taxpayers would have ever sought out employment there.[5]

On the basis of this, the Government then contends that this Taxpayer does not meet the person Congress described as a "bona fide resident." This is because, so the argument runs, Congress enacted the tax exemption in order to encourage, promote and stimulate the foreign trade of our country. In support of this thesis, it emphasizes what we and others have said. Thus in Swenson v. Thomas, 5 Cir., 1947, 164 F.2d 783, in discussing the predecessor of § 911(a) (1), we commented: "It is demonstrable from the history of that legislation that the exemption was made in the interest of foreign trade, to induce Americans to accept employment abroad and put American business on an equality with foreign competitors. * * * [T]he change was made not because of a reversal [in 1942] of the original purpose to encourage foreign employment of Americans, but to so tighten the law as to require bona fide residence * * *." [6]

"when a German V-2 rocket carrying an Army WAC Corporal missile as a second stage roared from its pad." We dealt with a mundane problem related to this less spectacular program in Blake Constr. Co. v. United States, 5 Cir., 1958, 252 F.2d 658.

5. The following is typical of the facts emphasized by the Government. Ascension Island, 4401 nautical miles from Patrick Air Force Base, is a volcanic, hilly island, roughly about seven miles in diameter, with little vegetation or industry. It has no local commercial transportation and no commercial air service. There are no hotels. Of the 200 residents, 50 are Britishers, the balance of Indian descent. One Taxpayer described it as "more isolated than anything you ever want to be on. * * * There is no place to go, no where to come back from." The 339 Pan Am American civilian employees lived in barracks and quonset huts on the Base. Mayaguana Island, 544 nautical miles from Patrick, formed of coral sandstone, seven miles wide and 28 miles long, has a population of 700, all natives, with farming and fishing as its major occupations. It is without commercial transportation, housing or hotels. The 9 Pan Am civilian employees lived in barracks on the base. San Salvador, 414 miles from Patrick, formed of coral limestone, 12 miles long, has a population of less than 900 with all but one being natives. No products are manufactured for export. It is without commercial transportation, hotels, and private housing facilities. The 213 Pan Am civilian employees lived in barracks on the base which was fenced in and guarded. Grand Bahama, 152 miles from Patrick, is bigger (83 miles long) and more heavily populated (5800), but there was little farming, commercial activity with "unskilled labor * * * available at three shillings per hour," and all but about 1% of the population are natives. The 315 Pan Am civilian employees lived in barracks on a base fenced in and guarded. For about a month the wife and children of one of the Taxpayers lived in "a small shack which had no running water. And with no glass windows * * * no electric lights * * * [it had] an outside toilet some 75 to 100 feet from the house."

6. The Government points to similar comments in Downs v. Commissioner, 9 Cir., 1948, 166 F.2d 504, 507, 509; Commissioner v. Fiske's Estate, 7 Cir., 1942, 128 F.2d 487; Meals v. United States, D.C. Cal., 1953, 110 F.Supp. 658, 660; White v. Hofferbert, D.C.Md., 1950, 88 F.Supp. 457, 465; and also H.Rep.No. 1, 69th Cong., 1st Sess., 7 (1939–1 Cum.Bull. (Part 2) 315, 320), accompanying the Bill enacted as Section 213(b) (14), Revenue Act of 1926, c. 27, 44 Stat. 9, a forerunner of § 911(a) (1) of the 1954 Code. "In an endeavor to take one further step toward increasing our foreign trade it is recommended in this paragraph [Section 213(b) (14)] that there shall be excluded from gross income in the case of our citizens employed abroad in selling our merchandise amounts received as salary or commission for the sale for export of tangible personal property produced in the United States * * *." See also S.Rep.No. 52, 69th Cong., 1st Sess., 20–21 (1939–1 Cum.

■ Of course this thesis rests on the unquestioned and universally recognized purpose of Congress in enacting the 1942 forerunner of § 911(a) (1) to eliminate the many abuses which had arisen under the former law which required, not presence *in* a foreign country, so much as absence *from* the United States.[7] Downs v. Commissioner, 9 Cir., 1948, 166 F.2d 504, 508, cert. denied, 1948, 334 U.S. 832, 68 S.Ct. 1346, 92 L.Ed. 1759; Souza v. Commissioner, 1960, 33 T.C. 817, 324; S.Rep. No. 781 82d Cong., 1st Sess., 52, U. S. Code Congressional and Administrative News 1951, p. 1969; Meals v. United States, 1953, N.D.Calif., 1953, 110 F.Supp. 658, 660–661; and Swenson v. Thomas, 5 Cir., 1947, 164 F.2d 783, 784.

This argument, in our view, is neither persuasive nor sufficient. Despite the difficulties in applying the term "bona fide residence," characterized by some as "slippery"[8] and as being as variable as Joseph's coat of many colors,[9] and by others as "elusive,"[10] we think the promoting-foreign-trade-test offers no real guide or help. Modern business is complex and the activities which companies or individuals regard as commercially feasible or profitable are varied. Consequently, we think it would be a very rare case indeed in which a Court, as are we here, could be urged to hold as a matter of law that neither Pan Am nor its civilian employees could have considered this a corporate or individual vocation pursued as American traders with a profit motive.

■ In similar vein, we would have to conclude that if the detailed circumstances concerning the activities of these Taxpayers, their efforts to assimilate themselves into whatever community life was available in these primitive societies, the indefinite extent and duration of their service and employment, and like factors were significant, we could not displace the fact findings of the Tax Court. They are certainly not clearly erroneous, F.R. Civ.P. 52(a); Int.Rev.Code of 1954, § 7482(a), 26 U.S.C.A. § 7482(a), whatever might have been our evaluation of them were we the trier of this mixed question of fact and law.

■ Our reversal of this case rests on our conclusion that, as a matter of law, the treaties between the two governments kept the presence of these civilian employees from ever ripening into residence.

There was, first, a virtual cession of territory to the United States during the life of the treaty. The United Kingdom, in collaboration with Island authorities, obligated itself to "provide * * * such Sites for the purpose of the operation of the Long Range Proving Ground as may * * * be necessary." By a provision that "access to the Sites shall not be permitted to persons not officially connected with" the Missile Testing Program except by joint consent of the senior British and American representatives, the territory, comprising a site was effectually withdrawn from the local government. This was in no sense confined to the geographical boundary of the sites, since extensive rights were granted for activities within the "Range Area".[11] Likewise accorded was the vicarious right

---

Bull. (Part 2) 332, 348); H.Conference Rep.No. 356, 69th Cong., 1st Sess., 33 (1939–1 Cum.Bull. (Part 2) 361, 364).

7. Mere physical presence in a foreign country for 510 full days out of 18 consecutive months qualifies for a maximum exclusion of $20,000 under § 911(a) (2), which was enacted in 1951 by § 321(a) (2) Revenue Act of 1951, ch. 521, 65 Stat. 452. Taxpayer does not meet this test in any of the years here involved.

8. Commissioner v. Swent, 4 Cir., 1946, 155 F.2d 513, 515.

9. "Residence * * * has an evasive way about it, with as many colors as Joseph's coat," Weible v. United States, 9 Cir., 1957, 244 F.2d 158, 163.

10. Sochurek v. Commissioner, 7 Cir., 1962, 300 F.2d 34, 37.

11. This was defined as being "* * * that part of the Long Range Proving Ground which lies within the territory of [the specific island], including the territorial waters thereof."

of condemnation of entering upon, inspecting and "taking any necessary measures" on off-site land if required "to improve sanitation and protect health" on the Sites.

The full sweep of such extraterritorial rights was reflected by treaty provisions concerning personnel. These provisions also revealed a purpose to treat Pan Am's civilian employees as something other than (a) local residents subject to local authorities or (b) immigrant-aliens subject to local law. Thus, the treaties expressly provided that "the immigration laws of [the named] island shall not operate or apply so as to prevent admission * * * of any person * * * employed by, or under a contract with, either the Government of the United States * * * or a contractor, in connection with the establishment, maintenance, or use of the * * * Proving Ground." This extraordinary privilege was coextensive with employment by Pan Am on the Missile project since the United States bound itself to notify the local authorities of any change of status for deportation of such persons by the United States if required. Likewise, such employees were exempt from import, excise, consumption or other tax, duties or imposts of the local governments with respect to personal belongings imported by United States citizens or purchased by them at Post Exchange or Commissary Stores at the site. Perhaps more impor-

tant, in this day and world of high taxes, the employees were exempted from income tax imposed upon alien residents of the islands or citizens of the islands with respect to income earned in "connection with the establishment, maintenance, or use of the Long Range Proving Ground." The tax exemption also covered the "ownership or use of property which is within a Site, or situated outside [the named] island." These privileges were likewise extended to the contractors, subcontractors, or beneficial owners thereof and included specifically any "income tax * * in respect of any profits derived under a contract * * * with * * * the United States" or any "license [tax] in respect of any service or work for the * * * United States."

Even more vital, these civilian employees had a complete or partial immunity from the operation of local laws and local governmental authorities. Classified as "a person * * * who is * * subject to the United States Uniform Code of Military Justice," [12] the treaty exempted such employees from arrest, service of process, civil or criminal, while within the Site, "except with the permission of the Commanding Officer in charge of the United States Forces in such Sites." More important, under this classification, the United States was granted "the right to exercise * * * exclusive jurisdiction over security offenses" [13] on or off the site. The treaty

12. This term is defined in 10 U.S.C.A. § 802 (Art. 2): "The following persons are subject to this chapter: * * * (11) Subject to any treaty or agreement to which the United States is * * * a party * * *, persons serving with, employed by, or accompanying the Armed Forces outside the United States [except certain defined territory, Alaska, Canal Zone, etc.]. (12) Subject to any treaty or agreement to which the United States is * * * a party * * *, persons within an area leased by or otherwise reserved or acquired for the use of the United States which is under the control of the Secretary concerned and which is outside the United States and [specified excluded territory, Alaska, etc.]." August 10, 1956, ch. 1041, 70A Stat. 37.

As a definition of status and determination of exemptions from the judicial power of the local government, the operation of the treaties was in no way infringed by Kinsella v. Krueger, 1956, 351 U.S. 470, 76 S.Ct. 886, 100 L.Ed. 1342, rehearing granted, 352 U.S. 901, 77 S.Ct. 124, 1 L.Ed.2d 92; Reid v. Covert, 1957, 77 S.Ct. 1222, 354 U.S. 1, 1 L.Ed.2d 1148, and related cases holding military trials in non capital cases to be an unconstitutional denial of jury trial for civilians.

13. These are defined to include offenses punishable under laws of the United States for "(i) treason; (ii) * * * sabotage or espionage or * * * official secrets; (iii) any other offense relating to operations in [the] island of

prescribed "concurrent jurisdiction over all other offenses [14] wherever committed." Specific machinery was also established to enable the United States to exert or waive its right to exclusive jurisdiction and for mutual determination as to the trial of cases of concurrent jurisdiction.

These employees are in these islands solely because of the terms of the treaties. Under this basic arrangement, these civilian employees have rights and privileges which set them apart from the general community. They bear none of the usual obligations of a local resident, whether citizen or alien resident. They are exempt from all of the affirmative obligations and responsibilities of a resident citizen or alien. And as to the universal negative obligation imposed on all inhabitants not to violate established law, they are above the community and beyond the reach of its judicial power unless a reasonable official of the United States Government purposefully waives the right to exert exclusive or concurrent jurisdiction. They are in no real sense then a part of the local community. They are free from all of the ordinary, traditional and essential burdens of the people who work, live, own property and pay taxes there. They are merely present and presence alone, since the amendment of 1942, has not been sufficient.

Conceding that the Taxpayers in good faith intended to work in one or more of these islands wherever Pan Am would send them for an indefinite period of time for employment which might extend over many years [15] and each did his best to enter into the life of the community to the fullest extent of this primitive society, the existence of each, except for the physical environment imposed by presence, was for all practical purposes the same as within the United States. Extraterritorial rights, privileges, and immunities of the fundamental kind accorded here keep this physical presence from ripening into actual residence in a foreign country. We emphasize this inescapable consequence of the basic relationship created by the treaties to make clear that while the result here is the same as in Downs v. Commissioner, 9 Cir., 1948, 166 F.2d 504, cert. denied, 1948, 334 U.S. 832, 68 S.Ct. 1346, 92 L.Ed. 1759, and Jones v. Kyle, 10 Cir., 1951, 190 F.2d 353, cert. denied, 1951, 342 U.S. 886, 72 S.Ct. 175, 96 L.Ed. 664, we do not rely, as did such decisions, on the limited, restricted nature of the employment in terms of time and nature of work to be accomplished.

Whether for 20 days or for 20 years, employment under the arrangement authorized by such a treaty could not amount to residence *in* a foreign country, no matter how bona fide the *presence* might be.

Reversed.

the Government of the United States * * * under this Agreement, or to the safety of any equipment or other property of the * * * United States * * * in [the] island under this Agreement."

14. This included the so-called "United States interest offense" defined broadly as an act solely against the interests of the United States or a person or property of the United States "present in [the] island by reason only of * * * employment in connection with" the missile program.

15. The treaties are to expire in 25 years.