Ewell K. and Phyllis Nold v. Commissioner.
Nold v. Commissioner
Docket No. 1466-66.
United States Tax Court
T.C. Memo 1967-171; 1967 Tax Ct. Memo LEXIS 88; 26 T.C.M. (CCH) 802; T.C.M. (RIA) 67171; August 23, 1967
George A. Hrdlicka, for the petitioners. Ralph V. Bradbury, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined an income tax deficiency against petitioners for the year 1964 in the amount of $4,029.07. *89 Petitioners claim an overpayment of $1,922.23 for the same year. The only issue for decision is whether petitioner Ewell K. Nold was a bona fide resident of a foreign country or countries for an uninterrupted period which included an entire taxable year, so that the income from his employment for the taxable year 1964 is exempt from tax under section 911, Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Ewell K. and Phyllis Nold (herein called petitioners) are husband and wife and United States citizens. Their legal residence was Houston, Texas, at the time they filed their petition herein. Their joint Federal income tax return for the year 1964 was filed with the district director of internal revenue at Austin, Texas. Ewell K. Nold (herein called petitioner) retired from the United States Air Force on January 31, 1961, with approximately 21 1/2 years of service. The next day he was employed *90 by John W. Mecom of Houston, Texas. Mecom's United States operations involve the prospecting for and production of oil and gas, hotels, manufacture of oil workover, drilling equipment, plastics, chemicals, ranching, racehorses, and other diverse activities. His foreign activities involve prospecting for oil and gas as well as hotel operations. Foreign prospecting is done under concessions from the heads of the governments where Mecom has his operations. Each of these concessions runs for a given number of years during which time oil has to be produced in commercial quantities. A concession will expire unless it is renewed by negotiations between Mecom and the sheik or other ruling monarchs. Mecom's Middle East operations commenced in 1961 under a concession for drilling oil in the Kingdom of Yemen. The first shipment of materials was sent to Salif, Yemen, where the Middle East headquarters were located, in February 1961. All employees hired by Mecom for the Middle East drilling operations were hired as permanent employees. In an effort to keep employees at their foreign jobs, Mecom offered incentives such as bonuses to be paid only after a full year of overseas service had been completed. *91 Some of the original employees who went to the Middle East in 1961 are still employed there. Petitioner was employed by Mecom as chief pilot of the Middle East drilling operations. His employment entailed the supervision of personnel and equipment for the aviation section of those operations. Petitioner had from four to six aircraft, two helicopters and from 7 to 15 people under his supervision to support desert camp areas where drilling rigs were located. He accepted this position because it offered excellent pay as well as relatively few expenses, and because he and Phyllis hoped to accumulate money to invest in a ranch. At the time he was employed the petitioner understood that he would procure aircraft for delivery to Salif and supervise the aviation section in support of drilling operations which were to begin almost immediately thereafter. Petitioner also understood that he would travel back and forth between the United States and Salif with food and other supplies. Because of the great distances involved, it was soon decided to obtain fresh fruits and vegetables from Asmara, Ethiopia, and hardware and hard goods from Beirut, Lebanon. Still later it became apparent that it *92 was not necessary to make regular return trips to the United States. Salif is a primitive village located in a remote area. Mecom employees there were furnished with quarters at a base camp compound which was an old salt mine village built by the Germans. The permanent structures had been deactivated through the years and, after repairs, Mecom employees were moved into the buildings. However, because of the living and political conditions in Yemen, no employees ever had dependents in Salif. Petitioner was among the first Mecom employees at the Salif base camp compound. He was assigned a small apartment comprised of a bath, sitting room, and bedroom. This apartment was not for his exclusive use to the extent that it was shared with as many as two or three other persons at times during personnel buildups. He ate in the general mess at the company compound. During this period the petitioner generally made three trips a week from Salif to Asmara on company business. Since dependents of employees could not be taken to Salif, Mecom made arrangements for dependents to live in Asmara in company furnished quarters. Asmara was selected because there were no other facilities available for *93 them in the Middle East. Petitioner's wife and daughter left the United States for Asmara on June 5, 1961, with other employee dependents. They lived temporarily in a hotel furnished by Mecom until another hotel which was being converted into apartments for dependents was completed. A Mecom employee was manager of the apartment building and the apartments were furnished to dependents without cost to them. During the time Phyllis and her daughter lived there the petitioner was stationed in Salif and visited them whenever he could do so. The petitioners paid for their own food while in Asmara. Phyllis purchased a small car which the petitioners owned until she and her daughter left that city. Phyllis had a driver's license for use in Kagnew Station (United States Army) military base at Asmara. The native language of Asmara was Amharic which the petitioners did not speak. Many of the natives also spoke Italian, and Phyllis began a course in the Italian language a few weeks before she had to leave Asmara. In the fall of 1961 the petitioners' daughter attended school at Kagnew Station along with the children of the apartment manager. Association by petitioners with natives in Salif *94 was primarily for business purposes and the only English speaking people there were Mecom employees. Likewise, most of their social activity in Asmara centered around the Kagnew Station officers' mess. However, petitioners made a few friends among the local inhabitants of Asmara and Phyllis still corresponds with them. In October 1961, the company manager for the apartment where Phyllis and her daughter were staying told them to be prepared to leave immediately because of political unrest in Ethiopia. On October 7, 1961, Phyllis and her daughter left Asmara and returned to the United States. They did not go to Aden, Arabia, on that date because Mecom facilities for dependents there were not yet ready. Two families of Mecom employees remained in Asmara at the company furnished apartment until company quarters were available for them in Aden. The two children of the apartment manager who were in school with petitioners' daughter stayed in school at Kagnew Station until the following year when the apartment manager was moved to Aden. After leaving his quarters at Salif, petitioner had quarters at Hodeida, Yemen. In early 1962 Mecom began drilling operations in the Sheikdom of *95 Dofar in Arabia at a compsite called Midway. These operations were still in existence at the time of trial. Midway is located in the desert and was an established camp serving pervious oil concessions. When the Mecom operations began at Midway, the company transferred its offices in Salif to Aden because from Aden the company could supply both the Salif and Midway operations. Mecom had no concession at Aden. In September 1962, petitioner was furnished company quarters in Aden. It was a small apartment similar to the one which he had in Salif. Before his family joined him, his life in Aden was similar to that in Salif. He was away from Aden frequently on flying assignments and sometimes when he returned from a trip he would find that his room had been assigned to someone else in his absence. Since Aden has a European colony located within the city, employees were permitted to locate their families there in company furnished quarters. These were made ready for occupancy in the middle of 1962. Phyllis and her daughter arrived in Aden from the United States on June 8, 1963, and lived with petitioner in company furnished quarters. They purchased their own food there. Three weeks later *96 the petitioner was recalled to the United States on a business trip. He did not return to the Middle East until January 1964. Phyllis and her daughter remained in Aden. In September petitioners discussed enrolling their daughter in a school in Rome. However, they finally decided to send her to a private school in San Antonio, Texas. Consequently, Phyllis and her daughter voluntarily returned to the United States in September 1963. Petitioners had very little social contact with the natives of Aden during their stay there. Instead, most of their socializing was with company employees or other westerners. In February 1964 many Mecom employees were moved from Aden to Midway. Petitioner, who had returned to the Middle East on January 31, 1964, was reassigned to Midway on February 17 of that year. For a while he had company furnished quarters at both Aden and Midway since he often flew between those two places. The quarters furnished to employees at Midway were temporary prefabricated hutments on movable skids located in a fenced and guarded company compound. At Midway the petitioner was assigned a single room with another person containing a water basin, wall lockers, footlockers, *97 and a chifforobe. He ate at a small general mess there. There were no facilities for families at Midway. It was not a town when Mecom operations first located there and Midway had no social life except jukeboxes and movies at night. Native workers came from elsewhere and set up tents in which they lived. In late 1962 or early 1963, Mecom obtained an oil concession in Sharja on the Persian Gulf. This concession is still in operation. Another Mecom concession was located in Umm al Qaiwan, a British protectorate sheikdom on the Trucial Coast. This operation was subsequently discontinued because of a war there. Mecom obtained an oil concession in Jordan about March 1964 and began operations there in April of that year. He located his Jordanian headquarters in Amman, leasing facilities there. The company also had airplane facilities at the Amman airport with four aircraft stationed there. While the Amman, Midway, and Aden headquarters for Mecom operations were each basically self-sustaining, they did work together. Materials and supplies were transported back and forth by cargo plane. Phyllis and her daughter arrived in Amman from the United States on July 10, 1964. Petitioner first *98 obtained company quarters in a hotel. Mecom had its offices located in the same hotel and other company employees lived there also. Hotel accommodations and meals furnished petitioner and his family were paid for by Mecom. Petitioners moved into an apartment in Amman on September 29, 1964. Mecom paid the rent on the apartment but petitioners furnished their own food. On September 28, 1964, petitioners acquired an automobile which was subsequently sold on December 5 of that year. Petitioners acquired Jordanian automobile drivers licenses through Mecom and both were licensed to fly there. Validation of petitioner's United States pilot license was not required in other Middle East countries where he had been quartered by his employer. Petitioners had little time for socializing in Amman. They did not join any native clubs, social or fraternal. The native tongue in Amman is Jordanian or Arabic. Petitioner spoke only English, and Phyllis' Arabic was only sufficient to converse with weather people at the airport. There were no English language high schools in Amman. Petitioners' daughter returned to the United States in time to enter high school for the fall semester. While petitioners *99 had considered sending her to a high school in Europe, they preferred to leave her in a Catholic school in the United States where her relatives would be nearby in case of an emergency. On December 5, 1964, petitioner began a flight mission from Amman to Houston in a company plane. Phyllis was an unpaid crew member on that flight. Petitioners had sold their car and moved from their apartment as of that date. Because of operational difficulties they were required to leave the plane en route for repairs and petitioner was in structed to complete the mission in his own personal aircraft which had been left in Amman. On this trip they were snowed in at Reykjavik, Iceland, and returned to the United States in a commercial airplane. Later, an Icelandic airline pilot flew their plane to New York City where petitioner took delivery of it. Petitioners arrived in the United States on December 28, 1964. On December 19, 1964, one of the Mecom airplanes assigned to the Middle East operations was shot down over Egypt. This caused a cessation of Mecom aircraft flights over Egypt to Benghazi insofar as supplying operations in Jordan from the West were concerned. However, other flight operations *100 in Amman were continued. Each concession in the Middle East held by Mecom provided that there would be no income tax by the concession country upon either Mecom or his employees. Under these concessions the foreign countries required that each employee have a round trip ticket, so that, if his employment was terminated, he would be able to return to the United States. These concession contracts did not place any restriction on the employees in any manner. However, Mecom was responsible for the conduct of his employees and their expenditures while in a particular foreigh country. Had any employee entered into local politics, he would have been requested to leave the country. Visas were required in the various Middle East countries and were acquired for all Mecom employees by the company.however, flight crew members, in lieu of visas, surrendered their passports when they entered a country and picked them up when they departed. Company policy with regard to dependents of Mecom employees in the Middle East was dictated by the political situation. On several occasions during the years involved herein the American Embassy advised Mecom that dependents should not accompany employees *101 there. As a result, there were changes in company policy concerning dependent personnel going to the Middle East. Mecom's policy with respect to withholding income tax from the pay of employees was that the company would withhold such taxes until an employee had been out of the United States for 510 days. Thereafter, it would not withhold. Throughout petitioner's employment with Mecom there was Federal income tax withholding from his compensation. Since petitioner went to the Middle East with a sponsor, it was not necessary for him to register in any Middle East country as an alien, resident, or nonresident. He paid no taxes in any foreign country during the years 1961 through 1964. Petitioner stayed in the Middle East solely because of his employment with Mecom and Mecom's contracts in those countries. Excluding the period prior to his employment with Mecom, petitioner was in the United States during the years 1961, 1962, 1963, and 1964, respectively for 109, 172, 270, and 122 days. Petitioner was physically present in the United States on the dates shown below: Number of Days
From
To
in United States
May 8, 1961
June 5, 1961
29
October 7, 1961
October 17, 1961
11
October 24, 1961
January 5, 1962
74
April 20, 1962
July 5, 1962
77
August 30, 1962
September 14, 1962
16
September 21, 1962
October 7, 1962
17
November 5, 1962
February 16, 1963
104
April 13, 1963
June 8, 1963
57
July 19, 1963
January 31, 1964
197
April 4, 1964
June 2, 1964
60
June 14, 1964
July 10, 1964
27
December 28, 1964
Termination of
employment in
May of 1965
4 (in
1964)
*102 In 1961 and 1962 the petitioner's trips to the United States were primarily for the purpose of hiring additional personnel, training for himself or crews, awaiting equipment to deliver to the Middle East, transporting dependents, and acquiring aircraft for use in the Middle East. However, during these years he also performed other jobs for Mecom which were not related to Middle East operations. For example, he made a flight to Lima, Peru, between October 7, 1961, and October 17, 1961, on which he transported company personnel who were in no way connected with Middle East operations. When petitioner was in the United States he generally used an airplane assigned to domestic operations. Petitioner was away from the Middle East from July 19, 1963, until January 31, 1964. A number of the flights made during this six-month period in the United States had no relationship to Mecom's Middle East operations. On September 7, 1963, petitioner transported a group of company personnel to McAllen, Texas, for a Government bid opening. On September 23, 1963, he flew to its hangar an antique airplane which was on display at the National Business Aircraft Association meeting in Houston. On October 28, 1963, he *103 took a training flight with a Captain Harrison who was not attached to foreign operations. Between November 27 and November 30, 1963, he flew to Palo Blanco on a hunting trip. On December 26, 27, and 28, 1963, he flew to the Mecom ranch as a copilot for a Mecom domestic pilot. On other occasions he flew people to and from the Mecom ranch at Laredo, Texas. Petitioner's employment with Mecom was terminated in May 1965. Between December 28, 1964, and the termination of his employment, petitioner again performed duties related to Mecom operations other than those in the Middle East. On February 17, 1965, petitioner flew to Hitchcock, Texas, to show a domestic airplane to a prospective customer. In March 1965, he flew to Quincy, Florida, to inspect an aircraft for anticipated use in Colombia, South America. He also made a flight in that month to New Orleans to look at another airplane for possible use in Peru. On March 29 he flew to Beaumont, Texas, to inspect a third aircraft for possible use in South America. Between April 29 and May 2, 1965, he flew company personnel to Louisville, Kentucky, to see the Kentucky Derby. On May 21, 1965, he flew to Memphis, Tennessee, to deliver an aircraft *104 which had no connection with Middle East operations. In April 1964, petitioner flew King Hussein of Jordan around the United States. This trip was in connection with Mecom's Middle East operations. At the time petitioner accepted employment with Mecom, he and his family lived at 330 Empress Drive in Houston, Texas. Whenever they were in Houston during the period of petitioner's employment with Mecom they lived at this address. Petitioner returned there upon his arrival in the United States on December 28, 1964, and he and his wife lived at that address at the time of trial. Throughout the period of petitioner's employment with Mecom he maintained his telephone and telephone listing in Houston. Petitioners placed a "For Sale" sign in front of their home each time Phyllis and her daughter went overseas. A neighbor would show the house to interested parties. At no time was the house rented or held out for rent. Petitioner's salary was deposited in a bank account maintained by him in Houston. During his employment with Mecom he had no bank account in the Middle East except one in Beirut, Lebanon, which reflected the single transaction of his purchase of an airplane in August 1964. *105 Petitioner used his Houston bank account to pay personal expenses while he was in the Middle East as well as company expenses for which he was reimbursed He had a safe deposit box in Houston. He made investments in the Southland Investment Plan during his employment with Mecom. When petitioner was employed by Mecom on February 1, 1961, he belonged to several professional organizations from which he never resigned. He maintained charge accounts in various Houston stores while he was employed with Mecom and sometimes used his American credit cards for purchases in the Middle East. He owned rental property in Houston during the years 1961 through 1964. His bank in Houston collected the rents and paid the taxes on such property. His father looked after the property. In 1964 the petitioners made contributions to the Girl Scouts and assorted home drives in Houston. Petitioners did not take any furniture for their personal use from the United States to the Middle East and they did not purchase any furniture in the Middle East. When petitioner went to the Middle East for the first time in 1961, he did not take all of his clothing with him and at no time during the years involved did he *106 have all of his clothing with him there. The remaining clothes were left in Houston. Throughout his employment with Mecom the petitioner was regarded by company officials as an employee assigned to Mecom's Middle East operations. His activities were so reflected on Mecom's books and records and his entire salary was allocated to foreign operations. During the year 1964 the petitioner received wages from Mecom in the total amount of $15,823.20. Petitioner excluded this amount from his Federal income tax return for the year 1964 on the ground that it represented income earned while he was a bona fide resident of a foreign country or countries. In his notice of deficiency respondent included in petitioner's income the wages received from Mecom on the ground that petitioner did not qualify as a bona fide resident of a foreign country or countries under the provisions of section 911(a)(1). Ultimate Findings 1. Petitioner was not a bona fide resident of a foreign country or countries for an uninterrupted period which included an entire taxable year. 2. All amounts received as wages by petitioner from Mecom in 1964 constituted taxable income. Opinion Petitioner seeks exemption *107 from taxation with respect to income which he earned in 1964 while employed by Mecom. He relies on section 911(a)(1), [2] claiming that he "has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year." He argues that he established a bona fide residence in Salif, Yemen, in March 1961 and that he maintained a bona fide foreign residence in various Middle East countries until December 28, 1964. *108 Respondent counters with the contention that petitioner was not a bona fide resident of a foreign country or countries in 1964. He argues that petitioner did not meet the requirement in section 911(a)(1) of an uninterrupted period of foreign residency either because his foreign residence did not include the entire taxable year 1964 or because he returned to and established a residence in the United States for a 6-month period from July 19, 1963, to January 31, 1964. Respondent also argues that the petitioner was not a bona fide resident of a foreign country or countries in 1964 by reason of the nature of his employment and his relationship to the foreign governments, his failure to integrate into the life of the various foreign countries, and his close ties to the United States and, in particular, to Houston. We view section 911(a)(1) as placing more than the usual burden of proof on the petitioner to show that he has met the requirements of the statute. Congress decided to add to the normal requirement that an exemption from income be strictly construed the condition that a taxpayer claiming *109 the exemption provided by section 911(a)(1) establish his status "to the satisfaction of the Secretary or his delegate [Commissioner]." We cannot ignore these words. If they mean anything, it is that the petitioner must offer strong proof in order to bring himself under the umbrella of section 911(a)(1) and that this Court should resolve any doubt in favor of the Commissioner. Cf. Frank Souza, 33 T.C. 817 (1960). In view of the facts established by this record, we are not convinced that the Commissioner erred in refusing to be "satisfied" that petitioner was a bona fide resident of a foreign country or countries in 1964. In fact, we think the petitioner failed to become a bona fide resident of Salif, Yemen, in 1961 or of any other Middle East countries where he was employed until December 1964. Also important in our consideration of this case is the legislative history of section 911(a) and its predecessors. It was in 1942 that Congress changed its standard from permitting exemption by proving "nonresidency" in the United States to the more rigid requirement that the taxpayer prove himself to be a bona fide resident of a foreign country. [3] Then in 1951, Congress, *110 stating that stringent application of the bona fide residence requirement caused a hardship on many individuals working overseas, enacted an additional test which provided for exemption as a result of mere physical presence in a foreign country for a specified period of time. [4] At that time Congress chose not to revise, amend or alleviate the strictness of the bona fide residence requirement. Thus the legislative history leads us to believe that Congress expected the courts to interpret narrowly the exemption provision of section 911(a)(1). We recognize that the regulations under section 911 refer to section 871, pertaining to aliens, and the regulations thereunder for guidelines in ascertaining whether a taxpayer qualifies as a bona fide resident. Section 1.871-2(b), Income Tax Regs., defines an alien resident as one "who is not a mere transient or sojourner, *111 " and states that whether an alien is a transient is "determined by his intentions with regard to the length and nature of his stay." However, these guidelines must be viewed in the light of the legislative history and the burden of proof under section 911(a). It is, of course, well established that whether a taxpayer qualifies as a bona fide resident of a foreign country or countries is essentially a question of fact which requires that each case be decided on its own particular circumstances. Prior decisions are of little aid and often difficult to reconcile. See Leonard Larsen, 23 T.C. 599, 604 (1955); Donald H. Nelson, 30 T.C. 1151, 1153 (1958), and the cases cited therein. Suffice it to say that there is no straight path through the vast labyrinth of decisions. Although petitioner testified that he intended to engage in foreign service for a period of 10 years, his avowed intent is overshadowed by the uncertain nature of Mecom's continuing operations in the Middle East and by his failure to become a part of the society in those countries to which he was assigned. Cf. Joseph A. McCurnin, 30 T.C. 143 (1958), and Ernest Rudolf Hertig, 19 T.C. 109 (1952). *112 Petitioner's stay in the Middle East was rather tenuous and indefinite since it depended upon his employment with Mecom and the terms of Mecom's concession agreements from various Middle East countries. Compare Commissioner v. Matthew, 335 F. 2d 231 (C.A. 5, 1964), certiorari denied 380 U.S. 943 (1965); and Garvis O. Boyd, 46 T.C. 252 (1966), involving international treaties. He could remain in those countries only because Mecom sponsored him; and, if his employment terminated, he was required to leave the concession country. Mecom was responsible for his conduct. He did not obtain his own visas. He was not required to pay taxes in any Middle East country. These factors, among others, strongly indicate that petitioner did not become a bona fide resident of those foreign countries in which he was employed by Mecom. Petitioner did not make a genuine effort to become integrated into the society of those countries in which he was employed. His meals and lodging were usually furnished to him by Mecom at company quarters. He never attempted to learn a native language. He did not belong to any native clubs and had few native friends. Similarly, *113 Phyllis and her daughter lived in company quarters during the 4 months in 1961 when they were in Asmara. They also lived in company quarters during the 3 months in 1963 when they were in Aden. Phyllis and petitioner again lived in company furnished quarters or company paid quarters during the time they resided in Amman. In between her visits to the Middle East, Phyllis lived in the family home in Houston. There is little evidence of her integration into society during the periods when she was in the Middle East. While it is true that the presence of a taxpayer's family is not necessarily controlling as to his residence, Seeley v. Commissioner, 186 F. 2d 541 (C.A.0 2, 1951); Fred H. Pierce, 22 T.C. 493 (1954); David E. Rose, 16 T.C. 232 (1951), the fact that Phyllis chose to stay in Houston when there was an opportunity to join petitioner in the Middle East tends to negate the petitioner's assertion that he intended to make his residence in various Middle East countries where he was employed. Also damaging to petitioner's contention of bona fide foreign residence is his presence in the United States during the years 1961, 1962, 1963, and 1964 *114 for 109, 172, 270, and 122 days, respectively. Although much of this time was spent on Mecom's Middle East operations or on vacation, the petitioner retained his Houston home without ever renting it and lived there whenever he returned to Houston. He owned other property in Houston. He kept his bank accounts there. He left his clothing there. These facts reflect on the petitioner's claimed intent to be a bona fide resident of a foreign country or countries during the years 1961 through 1964. There is another, perhaps even stronger, reason why the petitioner fails to qualify for exemption from tax under section 911(a)(1). He was in Houston, living at his home on Empress Drive from July 19, 1963, through January 31, 1964. While he was paid through Mecom's foreign operations during that period, the record shows that many of his activities did not pertain to the company's Middle East operations but rather to Mecom's general operations. This period in Houston was more than a "temporary" visit to the United States as set forth in section 1.911-2(a)(2), Income Tax Regs., and it was not a business trip within the intendment of the regulations. Since petitioner *115 maintained so many contacts and engaged in so many activities in Houston, we think he was clearly a United States resident during such 6-month period. Section 911(a)(1) provides that in order to qualify for the exemption from income a taxpayer must be a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year. Regardless of his status during 1961, 1962, and the first half of 1963, petitioner was a resident of Houston from July 19, 1963, through January 31, 1964. His claimed bona fide foreign residence in Jordan could not have begun until January 31, 1964. It terminated on December 28, 1964. Hence, the uninterrupted period of claimed foreign residence did not include "an entire taxable year." After carefully considering all the facts and circumstances established by this record and the authorities relied on by the parties, we have concluded and found as an ultimate fact that the petitioner was not a bona fide resident of a foreign country or countries for an uninterrupted period which included the entire taxable year 1964 within *116 the meaning of section 911(a)(1). Therefore, all amounts received as wages by petitioner from Mecom in 1964 are includable in his gross income. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (a) General Rule. - The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: (1) Bona fide resident of foreign country. In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).↩
3. See S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 54, 116 (1942). ↩
4. See S. Rept. No. 781, 82nd Cong., 1st Sess., p. 53 (1951), pertaining to the predecessor provision of what is now section 911(a)(2)↩.