GARVIS O. BOYD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

R. P. PHILPOT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 91171, 92413. Filed May 17, 1966.

Garvis O. Boyd, pro se.
R. P. Philpot, pro se.
*Eugene B. Smith*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in the income taxes of petitioner Garvis O. Boyd for the calendar years 1956, 1957, and 1958 in the respective amounts of $706.85, $797.42, and $933.82 and

---

a deficiency in the income tax of petitioner R. P. Philpot for the calendar year 1958 and an addition to tax in the respective amounts of $1,191.55 and $297.89. Respondent has conceded that the addition to tax determined against petitioner Philpot for failure to file a return is not owing. The only issue remaining in these consolidated cases is whether during the years involved, petitioners, employees of Pan American World Airways, Inc., Guided Missiles Range Division, stationed on down range missile bases in the Bahama Islands, were bona fide residents of a foreign country or countries within the meaning of section 911(a)(1) of the Internal Revenue Code of 1954.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Garvis O. Boyd and Wilma I. Boyd, his wife, filed their joint Federal income tax returns (Form 1040) for the calendar years 1956, 1957, and 1958 with the district director of internal revenue in Jacksonville, Fla. Wilma did not join in filing the petition in this case and therefore is not a party to this proceeding. During the years in question, petitioner Boyd was employed by the Guided Missiles Range Division of Pan American World Airways, Inc. (hereinafter referred to as Pan American), on missile bases located in the Bahama Islands. He was stationed on Grand Bahama Island during 1956, 1957, and part of 1958 and on Grand Turk Island during the latter part of 1958.

Petitioner R. P. Philpot filed his Federal income tax return (Form 1040) for the calendar year 1958 with the director of international operations, Washington, D.C. During 1958, petitioner Philpot was employed by Pan American's Guided Missiles Range Division on Grand Bahama Island.

Prior to 1950, the U.S. Government established at Cape Canaveral (renamed Cape Kennedy), Fla., a site for the development of a long-range missile program. The responsibility for the development of this program devolved upon the U.S. Air Force.

On July 21, 1950, an agreement was entered into between the United States and the United Kingdom of Great Britain and Northern Ireland, with the concurrence of the government of the Bahama Islands, providing for a guided missile flight-testing range to extend through the Bahama Islands and the waters adjacent thereto, and to be used by both governments. The agreement was effective for a period of 25 years and thereafter until 1 year from the day on which either government should give notice to the other of its intention to terminate. The provisions of this agreement, together with all supplementary agreements, exchange of notes, addenda, and amendments relative thereto, are incorporated herein by reference. Subsequently other

agreements were executed by the United States and Great Britain extending the flight-testing range to include Antigua and Ascension Islands. These agreements are substantially the same as the above agreement.

Thereafter missile-tracking stations were constructed by the Air Force on sites over the 5,000-mile range extending from Cape Kennedy, Fla., to Ascension Island, including bases upon the islands of Grand Bahama and Grand Turk.

In 1953, the U.S. Air Force entered into a cost-plus-fixed-fee contract with Pan American under which Pan American undertook to furnish the services, personnel, and materials necessary for the management, operation, and maintenance, under the direction of the Air Force, of the missile test-range facilities installed by the Air Force on the various bases at Cape Canaveral (now Cape Kennedy), Patrick Air Force Base, Fla., and down range, including those located on Grand Bahama and Grand Turk Islands. The contract by its terms was for a period of 1 year, but from time to time it was extended until 1956 when another similar contract was executed between the same parties, which in turn was extended periodically. This agreement was in effect through 1958, as well as for some time thereafter.

Pan American was responsible for the operation and management of the missile stations, including maintaining facilities and equipment and planning and conducting range test operations. Each base was staffed with sufficient personnel to handle all administrative and operating functions. Once a base was established, Pan American was responsible for the housing, feeding, maintenance, supply, health, medical, recreation, and assignment of personnel. Food, prepared and served by Pan American cooks, was provided for Pan American employees in cafeteria-style dining halls located on the bases at no cost to the employees. Post exchanges were operated in conjunction with the dining halls for the employees' convenience. Laundry service and recreational activities were provided free of charge and a roving barber employed by Pan American was periodically available for haircuts at a small charge. Most of the Pan American employees lived on the bases in barrack-type quarters provided by Pan American without charge, although a few employees whose families had accompanied them down range lived in island housing.

Each base had both a military base commander and a Pan American base manager. Pan American employees were responsible only to the Pan American base manager. Each employee was expected to work any and all hours necessary to accomplish the mission of the range, but during off-work hours they could go and come from the bases to the island community without restriction.

Each employee received a 30-percent bonus, in addition to his salary, during his down range employment. The bonus was intended to serve

as an incentive for overseas duty and as compensation for irregular working hours and weekend duty. In addition to 20 working days paid vacation which accrued after 12 months of service, down range employees were granted periods of special leave time to give them an opportunity to transact personal business, obtain dental care, and have a change of scenery.

In a booklet which Pan American provided its down range employees, it was stated:

Although many of our employees have realized substantial benefits from the provisions of the income tax law, the Company takes no position concerning possible eligibility. It is strictly between the employee and the agent of the Bureau of Internal Revenue to whom he sends his return.

In accordance with a 1952 addendum to the agreement of July 21, 1950, between the United States and Great Britain, Pan American periodically gave the comptroller of customs and the immigration officer of the Bahama Islands the names of its employees who were employed down range.

Grand Bahama is the fourth largest of the Bahama Islands with a total of 430 square miles. In 1958 it had an estimated population of 5,800. Its main industry is lumber; secondary industries are fishing and agriculture. The missile base is located on the central southern coast of the island, near Gold Rock Creek, and is surrounded by a fence which separates the base from island property. There are two other missile installations on the east and west ends of the island, respectively, which are not surrounded by fences.

Grand Turk is 12 square miles in area and in 1958 had an estimated population of 1,800. It is one of the easternmost islands in the Bahamas and is located approximately 90 miles north of the Dominican Republic and 450 miles northeast of Jamaica. Its principal industry is the raking of salt and secondary industries are shipping dried conchs to Haiti and frozen crawfish to Miami. The missile base is located on the southwest coast of the island, not far from its capital, Cockburn Town.

*Facts Relating Particularly to Petitioner Garvis O. Boyd*

During January 1954, petitioner Garvis O. Boyd (hereinafter referred to as Boyd) was offered and accepted employment by Pan American's Guided Missiles Range Division as an electrician and mechanic. In April, Pan American solicited employees for its down range operations. Boyd accepted down range employment because of the inducement of a salary bonus and the income tax exemption available to foreign residents.

In connection with his down range employment, Boyd was stationed on Grand Bahama during the period January 1, 1956, through De-

cember 7, 1958, and on Grand Turk during the period December 8, 1958, through December 31, 1958. Prior to January 1, 1956, he was stationed on the island of Mayaguana, also one of the Bahamas, from May 1954 until approximately July 1955 when he was transferred to Grand Bahama. In a statement informing Boyd prior to his transfer to Mayaguana that Pan American would defray the cost of storing or transporting his personal effects, his transfer was classified as permanent in nature.

While employed by Pan American at the down range locations, Boyd lived in barracks on the missile bases. At all times during 1956 through 1958, Boyd's wife, Wilma, and his son, Carl O. Boyd, lived in a home owned by Boyd at 1019 Magnolia Street, New Smyrna Beach, Fla. They did not accompany Boyd down range because Carl was in high school and there were no high schools in the islands. During the years involved, Boyd paid real estate taxes and claimed a homestead exemption on his property in Florida. He also maintained a bank account in the Bank of New Smyrna, New Smyrna Beach.

Boyd made three trips to the United States in 1956, one on vacation and two on special leave time. He made at least three trips to the States in 1957, one for vacation and two on special leave time, and at least one trip in 1958 for vacation. On at least one of these trips he declared and paid duty as a foreign resident on liquor brought into the United States.

In a statement signed in Grand Bahama on December 28, 1955, declaring his intention to qualify for exemption from income tax in 1956 under section 911(a)(1) of the Internal Revenue Code of 1954, Boyd stated that he had been a bona fide resident of a foreign country or countries since May 1954.

During the years 1956, 1957, and 1958, Boyd received total salary or compensation from Pan American in connection with his employment down range in the respective amounts of $5,926.95, $6,430.10, and $7,120.32. On his joint Federal income tax returns filed with his wife for these years, Boyd reported these amounts as excludable income. On his 1956 return, he claimed a refund in the amount of $4.07 for income tax withheld in 1956. No other amounts for income tax were withheld from his salary during 1956, 1957, or 1958. On a Statement to Support Exclusion of Income Earned Abroad (Form 2555) filed with his 1958 return, Boyd claimed exclusion of his 1958 salary on the basis of bona fide residence in a foreign country.

In his statutory notice of deficiency mailed on November 18, 1960, respondent determined that the amounts received by Boyd from Pan American as compensation in 1956, 1957, and 1958 are includable in his taxable income for those years under section 61 of the Internal Revenue Code of 1954.

Boyd was not a bona fide resident of a foreign country during any of the years 1956, 1957, and 1958 within the meaning of section 911(a)(1) of the Internal Revenue Code of 1954.

*Facts Relating Particularly to Petitioner R. P. Philpot*

During September 1956, petitioner R. P. Philpot (hereinafter referred to as Philpot) was offered and accepted employment with Pan American's Guided Missiles Range Division as a fuel mechanic in the down range missile program. From September 1956 until sometime in December 1957, Philpot was stationed on Grand Turk. In December 1957, he was transferred to the missile base at Gold Rock Creek on Grand Bahama, where he remained stationed during all of 1958 and for several months thereafter.

During his employment down range, Philpot lived in barracks on the missile bases. He owned no property in the United States during 1958. Prior to going down range, he gave up an apartment which he had been renting in Florida.

After a conversation with a Pan American base accountant in January 1957, Philpot signed a form stating his intention to qualify for exemption from the income tax as a bona fide resident of a foreign country and requested that Pan American cease withholding the tax from his pay check. On his Federal income tax return for 1956, he requested a refund of tax withheld from September 1956 until January 1957. In August 1958, he received a check from the Internal Revenue Service.

During 1958, Philpot made three trips to the United States, one for medical reasons, one on company business, and one on personal business. On these trips he declared and paid tax as a foreign resident upon liquor brought into the States.

Philpot received total salary or compensation from Pan American in 1958 in the amount of $6,613.45. On his Federal income tax return for 1958 (Form 1040) he reported no income and no tax due. In a Statement to Support Exclusion of Income Earned Abroad (Form 2555), attached to his return, he reported the amount of his salary as income earned abroad excludable because of his bona fide residence in a foreign country. In a statement supporting his claim of bona fide foreign residence, he stated in part: "I have no contract with my employer, Pan American World Airways, Inc., and I intend to remain in foreign service for an indefinite period of time."

Respondent, in his statutory notice of deficiency, determined that Philpot was not a bona fide resident of a foreign country during 1958 and that his compensation from Pan American is includable in his taxable income for 1958 under section 61 of the Internal Revenue Code of 1954.

Philpot was not a bona fide resident of a foreign country during 1958 within the meaning of section 911(a)(1) of the Internal Revenue Code of 1954.

### OPINION

The sole issue is whether petitioners were bona fide residents of a foreign country or countries within the meaning of section 911(a)(1) of the Internal Revenue Code of 1954 [1] so that they are entitled to exclude amounts earned during the taxable years involved as employees of Pan American on down range missile sites in the Bahama Islands. Neither petitioner contends that he qualifies for exemption under section 911(a)(2) by having been physically present in a foreign country or countries during at least 510 full days of any period of 18 consecutive months.

These consolidated cases are closely related in fact to *Lyon Tyler Matthew*, 38 T.C. 417, reversed 335 F. 2d 231 (C.A. 5, 1964), certiorari denied 380 U.S. 943 (1965). Each of the three petitioners in that consolidated case was employed by Pan American's Guided Missiles Range Division in connection with the down range missile program. During the taxable years in question ranging from 1956 through 1958, the petitioners were stationed at various missile sites in the Bahama Islands (Grand Bahama, Eleuthera, San Salvador and Mayaguana) and on Antigua and Ascension Islands. Each of the petitioners lived on the military bases located at the missile sites. Each socialized with the island residents, attended local churches, and engaged in other island activities. During the years in issue the petitioners' wives lived in the United States. Each petitioner intended to remain permanently in the employment of Pan American on down range missile sites.

This Court found on the facts in those cases that each petitioner was a bona fide resident of a foreign country within the meaning of section 911(a)(1) and therefore was entitled to exclude from his gross income amounts earned as compensation for his employment at the down range locations. The Court of Appeals for the Fifth Circuit,

---

[1] Except as otherwise indicated, all section references hereinafter will refer to the Internal Revenue Code of 1954.
SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.
(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle :
(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof); if such amounts constitute earned income (as defined in subsection (b)) attributable to such period ; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

while stating that it would not disturb this Court's ruling if the detailed circumstances of petitioners' activities, the indefinite duration of their down range employment, and similar factors were significant, reversed on the grounds that, as a matter of law, the treaties between the United States and Great Britain kept the petitioners' presence in the islands from ever ripening into residence. The Court pointed out that there was a virtual cession of territory to the United States during the life of the treaty and that the full sweep of such extraterritorial rights was reflected by treaty provisions concerning personnel which revealed a purpose to treat Pan American's civilian employees as something other than (a) local residents subject to local authorities or (b) immigrant-aliens subject to local law. It explained that under the treaty the immigration laws of the islands would not operate to prevent admission of any person employed by the U.S. Government, or a contractor, in connection with the maintenance of the missile range and that such employees were exempt from import, excise, consumption or other tax, duties, or imposts of the local governments. More important, the Court said, was the fact that the employees were exempt from income tax imposed upon alien residents or citizens of the islands. The Court considered even more vital the fact that these civilian employees had a complete or partial immunity from the operation of local laws and local governmental authorities, since they were exempt from arrest within the missile sites except with the consent of the commanding military officer, and, since the United States had exclusive jurisdiction over security offenses on or off the sites and concurrent jurisdiction over all other offenses wherever committed. In summary, the Court said (p. 236):

These employees are in these islands solely because of the terms of the treaties. Under this basic arrangement, these civilian employees have rights and privileges which set them apart from the general community. They bear none of the usual obligations of a local resident, whether citizen or alien resident. They are exempt from all of the affirmative obligations and responsibilities of a resident citizen or alien. And as to the universal negative obligation imposed on all inhabitants not to violate established law, they are above the community and beyond the reach of its judicial power unless a reasonable official of the United States Government purposefully waives the right to exert exclusive or concurrent jurisdiction. They are in no real sense then a part of the local community. They are free from all of the ordinary, traditional and essential burdens of the people who work, live, own property and pay taxes there. They are merely present and presence alone, since the amendment of 1942, has not been sufficient.

Conceding that the taxpayers in good faith intended to work in one or more of these islands wherever Pan Am would send them for an indefinite period of time for employment which might extend over many years[15] and each did his best to enter into the life of the community to the fullest extent of this primitive society, the existence of each, except for the physical environment imposed by presence, was for all practical purposes the same as within the

United States. Extraterritorial rights, privileges, and immunities of the funda-
mental kind accorded here keep this physical presence from ripening into actual
residence in a foreign country. We emphasize this inescapable consequence
of the basic relationship created by the treaties to make clear that while the
result here is the same as in *Downs* v. *Commissioner*, 9 Cir., 1948, 166 F. 2d
504, cert. denied, 1948, 334 U.S. 832, 68 S.Ct. 1346, 92 L.Ed. 1759, and *Jones* v.
*Kyle*, 10 Cir., 1951, 190 F.2d 353, cert. denied, 1951, 342 U.S. 886, 72 S.Ct. 175,
96 L.Ed. 664, we do not rely, as did such decisions, on the limited, restricted
nature of the employment in terms of time and nature of work to be accomplished.

Whether for 20 days or for 20 years, employment under the arrangement au-
thorized by such a treaty could not amount to residence *in* a foreign country, no
matter how bona fide the *presence* might be. [Footnote omitted.]

The treaties in the instant case, which have been incorporated
herein by reference, are the same as those which have been discussed
in detail and found controlling by the Fifth Circuit in the *Matthew*
case. Petitioners worked and lived on missile bases in the Bahama
Islands for the same employer and under similar circumstances as
did the petitioners in the *Matthew* case, involving the same taxable
years. Petitioners have not, however, shown participation in the local
community life of the islands during the years involved to the extent
shown by the taxpayers in the *Matthew* case.

We find nothing in the present cases which would require a con-
clusion different from that of the Fifth Circuit Court of Appeals
in the *Matthew* case. See also *Baden* v. *United States*, 233 F. Supp.
185 (N.D. Ohio 1964). Cf. *Richard W. Benfer*, 45 T.C. 277 (1965).
Accordingly, we hold that neither petitioner was a bona fide resident
of a foreign country during the years involved within the meaning
of section 911(a) and that neither petitioner is entitled to exclude
from gross income in those years compensation received from Pan
American for services rendered at the missile sites where they were
stationed.

Reviewed by the Court.

> *Decision will be entered for the respondent
> in Docket No. 91171.*
> *Decision will be entered under Rule 50 in
> Docket No. 92413.*

Hoyt, *J.*, concurs in the result.

---

Simpson, *J.*, concurring: I agree with the result reached in the
majority opinion, but I am disturbed by the apparent rationale for
reaching that result.

I agree that the petitioners in this case did not become residents of
the Bahamas. My conclusion is based upon an examination of all
of the facts in the case. Since the petitioners in the case before us
resided on the base, they derived the maximum benefit from the pro-

visions of the treaty; they were more immune from Bahamian law than if they had resided off the base; and they did little to integrate themselves into the community. Thus, based upon the circumstances of this case (including the effect of the treaty), I also conclude that these petitioners did not become bona fide residents of a foreign country.

I am disturbed, however, because the majority opinion and the opinion of the Court of Appeals in *Commissioner* v. *Matthew*, 335 F. 2d 231 (C.A. 5, 1954), might be read to hold that any employee of Pan American subject to that treaty cannot acquire residency in the Bahamas. For example, I gather that if a Pan American employee brought his family to the Bahamas with him, lived off the base, took an active part in the life of the community, and intended to remain in the Bahamas indefinitely, the Fifth Circuit would nevertheless hold that he is not a resident of the Bahamas. I believe that the Court of Appeals improperly interpreted the effects of the treaty and as a result exaggerated the special privileges conferred upon these employees. I question whether this Court would hold that my hypothetical employee has failed to acquire foreign residence.

The apparent rationale in the majority opinion will have widespread ramifications. There are many other treaties in existence which confer similar privileges and exemptions upon citizens of the United States who are working abroad. I am concerned that if we appear to embrace the rationale of the *Matthew* decision, our action may be interpreted as holding that any American citizen who has privileges and immunities like those provided by this treaty cannot acquire residence outside the United States. I doubt that we mean to adopt such a rule. I know that I do not subscribe to it.

DAWSON and TANNENWALD, JJ., agree with this concurring opinion.