**Frank S. SCOTT, Jr.**
v.
**The UNITED STATES.**

**Alvin C. WARNICK and Barbara W. Warnick**
v.
**The UNITED STATES.**
**Nos. 36–66, 64–66.**

United States Court of Claims.
Oct. 16, 1970.

Angelo A. Iadarola, Washington, D. C., attorney of record, for plaintiffs. Wilkinson Cragun & Barker and Herbert E. Marks, Washington, D. C., of counsel.

Ira Mark Bloom, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller, Joseph Kovner and Norman J. Hoffman, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

DAVIS, Judge.

In these refund suits the Government requests our approval of an administrative gloss on the concept of "bona fide resident" as it appears in § 911(a) (1) of the Internal Revenue Code, relieving certain Americans of federal income tax on earnings abroad. The separate claims of taxpayers Frank Scott and Alvin and Barbara Warnick[1] were consolidated for trial because of similar questions of law and fact. From the trial commissioner's decision for the taxpayers, the Government seeks review.[2] Both parties accept the commissioner's basic findings of fact. However, the Government rejects Ultimate Findings 102 and 103,[3] as well as the result.

Taxpayers were and are United States citizens, employed as university professors, who accepted temporary positions with the Food and Agricultural Organization of the United Nations [FAO], to render services in Argentina, pursuant to an agreement between FAO and that nation. The treaty provided, *inter alia,* that plaintiffs would be granted benefits accorded by the Convention of Privileges and Immunities of the United Nations, including freedom from the Argentine income tax.[4] Frank S. Scott, Jr., professor of agricultural economics at the University of Hawaii, agreed to go to Buenos Aires to train a group of economists for various agricultural marketing and research programs in Argentina for a period of one year. The University granted him a sabbatical leave, and paid him one-half his normal yearly salary. Dr. Scott was also paid by FAO, that income forming the basis of his claim. He left the United States on December 3, 1960, arriving in Argentina four days later. He departed from Argentina on January 4, 1962, and returned to Hawaii to resume his University assignment. On his federal tax returns for 1961 and 1962, he excluded the amounts paid by FAO, as income received from foreign sources while a bona fide resident of a foreign country for an uninterrupted period including a full taxable year. 26 U.S.C. § 911(a) (1) (quoted *infra*). This income totalled $9,170.82 in 1961, and $2,499.10 in 1962, the latter having been earned in 1961, but not received until the following year.[5] The exclusions were subsequently disallowed in full, and a deficiency assessed by the Internal Revenue Service. Plaintiff paid the amounts allegedly owing, plus interest, totalling $3,657.-45 in 1961, and $426.76 in 1962, and filed a refund claim with the District

1. Barbara Warnick is a party only because she filed a joint tax return with her husband, Dr. Warnick, and in their case the words "plaintiff" and "taxpayer" refer only to him, unless the context clearly indicates otherwise.

2. We are indebted to Commissioner Roald A. Hogenson for his findings of fact, which we adopt in their entirety, and for his opinion, which has been very helpful. Because, on review, the defendant emphasized a position not strongly urged below—that, as a matter of law, the treaty between the United Nations and Argentina precludes taxpayers' recovery—we have found it necessary to expand the commissioner's treatment of the issues to meet the Government's additional arguments.

3. "102. Neither Dr. Scott nor Dr. Warnick was a mere transient, traveler, visitor, or sojourner during their respective stays in Argentina."

"103. Both Dr. Scott and Dr. Warnick were bona fide residents of Argentina, each for an uninterrupted period which included an entire taxable year, during which each received income from sources without the United States."

4. The relevant provisions of that Convention will be discussed later in Parts I and II, *infra*.

5. Both plaintiffs, Scott and Warnick, are on a cash receipts and disbursement basis, and thus would report the income earned during the year in which it was received.

Director. Upon denial of the claim, he began a timely suit in this court.

Dr. Warnick, professor of animal science at the University of Florida, likewise accepted an assignment with FAO in Argentina, to investigate the problems of cattle reproduction in that country. Unlike Dr. Scott, Professor Warnick was not granted a sabbatical, but instead obtained a leave of absence without pay. He left the United States with his wife and three children on December 30, 1962, arriving in Buenos Aires the same day. They remained in Argentina until January 2, 1964, when he returned to Florida and his previous position at the University. During his stay in Argentina, Warnick received $10,322.22 in salary from FAO, and $1,-149.31 in rents and royalties. On his joint tax return covering 1963, he excluded the FAO money, pursuant to § 911(a) (1), and claimed a refund of his entire prepaid estimated tax of $829.59. This was returned at first, but later the IRS disallowed the exclusion, and assessed him an additional $1,682.55. Dr. Warnick paid this amount, again asked for refund, and sued here.

I

Section 911(a) (1) states:

(a) *General Rule.*—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) *Bona fide resident of foreign country.*—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which

constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).[6]

The only contested issue is whether each taxpayer was a "bona fide resident" of Argentina during his stay there. On the basis of facts showing the integration of the taxpayers with the Argentine community, the trial commissioner decided that they were. Conceding the correctness of the findings from which the commissioner drew this conclusion, the Government nevertheless urges, as its principal point, that the privileges and immunities accorded taxpayers by the agreement between Argentina and FAO preclude, as a matter of law, a finding of "bona fide residency." That treaty made applicable to plaintiffs the Convention on Privileges and Immunities of the United Nations, which provided (in section 19) that plaintiffs would:

(a) Be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity;

(b) Enjoy the same exemptions from taxation in respect of the salaries and emoluments paid to them by the specialized agencies and on the same conditions as are enjoyed by officials of the United Nations [under this provision, Argentina did not impose its income tax on either plaintiff];

(c) Be immune, together with their spouses and relatives dependent on them, from immigration restrictions and alien registration;

(d) Be accorded the same privileges in respect of exchange facilities as are accorded to officials of com-

---

6. Subsection (c) (1) limits the exclusion to $20,000 or $25,000, depending on stated circumstances. Subsection (c) (6) is dealt with in Part III, *infra*. There are other limitations in subsection (c) which are admittedly inapplicable to these cases and need not be recited.

parable rank of diplomatic missions;

(e) Be given, together with their spouses and relatives dependent on them, the same repatriation facilities in time of international crises as officials [with] comparable rank of diplomatic missions;

(f) Have the right to import free of duty their furniture and effects at the time of first taking up their post in the country in question.

In addition, they were not subject to national service obligations. It is defendant's primary position that, whenever a citizen of the United States, living abroad, is exempted by such a treaty from the foreign income tax, and granted other privileges (of the type outlined above) under local law, he cannot, as a matter of law, become a resident of that country for the purposes of § 911(a) (1), regardless of the existence of other indicia of residency.

■ While § 911 does not itself define "bona fide resident", the Treasury Regulations refer us to § 871, and its regulations, for interpretive aid. Treas.Reg. § 1.911–2(a) (2). Section 871 deals with taxation of non-resident aliens in the United States, and that term is defined by Treas.Reg. § 1.871–2(b).[7] It is well-settled that courts employ the same standards of residency in determining whether Americans abroad are residents of a foreign country. Fuller v. Hofferbert, 204 F.2d 592, 597 (C.A.6, 1953); Hamer v. Commissioner, 22 T.C. 343, 347 (1954); *cf.* Weible v. United States, 244 F.2d 158, 164–165 (C.A.9, 1957).

The main requirement for residency in the regulations under § 871 is that the alien must not be "a mere transient or sojourner", and this is determined "by his intentions with regard to the length and nature of his stay." Furthermore, one who comes to accomplish a specific purpose which requires an extended stay is a resident even though he intends at all times to return to his domicile abroad. Obviously, there is a great deal of room for debate over the application of "bona fide resident" in § 911(a) (1), despite the help of regulation § 1.871–2(b), and the problem is often litigated. *See, e. g.,* Commissioner of Internal Revenue v. Wolfe, 124 U.S.App.D.C. 45, 361 F.2d 62, cert. denied, 385 U.S. 838, 87 S.Ct. 86, 17 L.Ed.2d 72 (1966); Commissioner of Internal Revenue v. Matthew, 335 F.2d 231 (C.A.5, 1964), cert. denied, 380 U.S. 943, 85 S.Ct. 1024, 13 L.Ed.2d 962 (1965); Sochurek v. Commissioner of Internal Revenue, 300 F.2d 34 (C.A.7, 1962); Chidester v. United States, 82 F.Supp. 322, 113 Ct.Cl. 87 (1949); Meals v. United States, 110 F.Supp. 658 (N.D. Cal.1953); White v. Hofferbert, 88 F. Supp. 457 (D.Md.1950); Benfer v. Commissioner, 45 T.C. 277 (1965). But the question the Government now poses does not concern the meanderings of all the outer boundaries of the indefinite notion of "bona fide residency". We are requested, rather, to hold that, whatever his other connections with the foreign country, an American taxpayer cannot be such a "resident" if he is exempt from the foreign income tax (and certain other obligations of the foreign law) under an agreement made by the foreign sovereign with this country, or another

7. "An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned."

country, or an international organization. That is one definitive test, we are told, which is imposed by the Internal Revenue Code.

■ In considering this submission, one is forced at once to note that neither § 911 nor § 871, nor their respective regulations, say that in terms, either directly or by necessary textual implication. Unlike the explicit reference in § 911 to taxpayers paid by the "United States or any agency thereof," there is no direct or express direction, or clear reference, excepting taxpayers in plaintiffs' category. On the contrary, it would be wholly consistent, linguistically, with the language of the statute and the regulations to hold that the factor of foreign-tax-exemption-by-treaty is not controlling in itself (though it may play a role along with other elements). Moreover, it is also clear that payment of a foreign income tax is not a condition precedent to the use of § 911(a) (1). The courts, including this one, have specifically rejected that precise contention in cases in which the local law did not tax the United States citizen, for one reason or another. Chidester v. United States, *supra,* 82 F.Supp. 322, 326, 113 Ct.Cl. 87, 94 (1949); Meals v. United States, *supra,* 110 F.Supp. 658, 662 (N.D.Cal.1953); White v. Hofferbert, *supra,* 88 F.Supp. 457, 461 (D.Md. 1950); Rose v. Commissioner, 16 T.C. 232, 238 (1951). *Cf.* S.Rep.No.1881, 87th Cong., 2nd Sess. (1962), 1962–2 U.S.C.C.A.N., pp. 3377, 3379–80, which recommended exclusion from § 911(a) (1) benefits those citizens who were exempt from foreign taxes *as a result of their statement to the foreign government that they were nonresidents,* see Part III, *infra.* (That suggestion is now embodied in § 911(c) (6).)

Defendant does not challenge these propositions. Its argument is, first, that although the exception for treaty-tax-exempt taxpayers does not appear from the words of the legislation it must be implied from the essential Congres-

sional purpose, and, second, that treaty-exemption differs significantly from tax exemption by the vagaries of the foreign local law.

For its evocation of an immanent but unstated Congressional purpose, the Government stresses the legislative history. What is now § 911(a) (1) was originally enacted in 1926 [8] to provide aid to American businessmen who sought to compete abroad with other foreign entrepreneurs, and that has continued to be its main goal. *See,* Commissioner of Internal Revenue v. Mooneyhan, 404 F.2d 522, 525 (C.A.6, 1968), cert. denied, 394 U.S. 1001, 89 S.Ct. 1593, 22 L.Ed.2d 778 (1969); Meals v. United States, *supra,* 110 F.Supp. 658, 663 (N.D.Cal.1953); White v. Hofferbert, *supra,* 88 F.Supp. 457, 461 (D.Md.1950). See, also, Hearings of the Senate Finance Committee on H.R. 7378, 77th Cong., 2nd Sess. Vol. 1, pp. 743–775 (1942); cf. S.Rep. 1881, 87th Cong., 2nd Sess. (1962), 1962–2 U.S.C.C.A.N., pp. 3377–3381. As initially enacted, the exemption was available to American citizens who were "non-residents" of the United States for six months or more in any taxable year. This exemption was quickly limited, however, by the exclusion of employees of the Federal Government or its agencies, Rev.Act of 1932, 47 Stat. 169, 204 § 116(a), because those workers were generally immune from the local taxes of the countries to which they were sent. *See* Krichbaum v. United States, 138 F.Supp. 515, 523 (E.D.Tenn.1956). *See, also,* Commissioner of Internal Revenue v. Mooneyhan, *supra;* Commissioner of Internal Revenue v. Wolfe, *supra,* 361 F.2d 62, cert. denied, 385 U.S. 838, 87 S.Ct. 86, 17 L.Ed.2d 72 (1966). Even so, this liberal provision lent itself to abuse, and in 1942 the House of Representatives desired repeal. *See* Hearings on H.R. 7378, *supra,* p. 761. It was amended, instead, to apply only to those who were bona fide residents of a foreign country for an uninterrupted period including a full taxable year. Despite these Con-

---

8. Rev. Act of 1926, 44 Stat. 9, 23, 26 § 213(b) (14).

gressional attempts to stop abuses of the privilege accorded by § 911, some misuse remained and, in 1953, the House again sought elimination of the provision. *See* S.Rep.No.685, 83rd Cong., 1st Sess. (1953), 1953–2 U.S.C.C.A.N., p. 2427, discussion of § 204. The Senate, however, remained firm in its conviction that the "bona fide resident" exemption was a necessary and useful device, and successfully resisted repeal. It did agree to fix dollar limits on the amount to be excluded from gross income. *See* S.Rep. No.685, 83rd Cong., 1st Sess. (1953), 1953–2 U.S.C.C.A.N., p. 2427; Technical Changes Act of 1953, 67 Stat. 615, 618, § 204 (1953), see note 6, *supra*. Finally, in 1962, Congress acted to prevent American citizens abroad from taking advantage of § 911(a) (1) by claiming they were non-residents of the foreign country when approached by that government for payment of income tax, and then arguing, in the United States, that they were entitled to the benefits of § 911(a) (1) as "bona fide residents" of a foreign country. Act of Oct. 16, 1962, 76 Stat. 1003, § 11(a), now 26 U.S.C. § 911(c) (6). *See* Weible v. United States, *supra*, 244 F.2d 158 (C.A.9, 1957); and Part III, *infra*.

From this history, several relevant conclusions emerge: (1) the primary (though not sole) Congressional aim in passing and maintaining § 911, and its predecessors, has been to aid and encourage American enterprise abroad; (2) Congress was and is aware that certain persons, because of the nature of their individual situation, may escape foreign, as well as domestic, income taxation; (3) Congress has acted specifically to eliminate some situations in which American citizens were escaping all taxation for reasons deemed inconsistent with the purposes of § 911(a) (1); and (4) in view of the avowed purpose of § 911, and the continued Congressional awareness that in some instances Americans can avoid all income taxation on foreign earnings, heavy weight should be given the significant legislative fact that Congress could, if it so desired,

precondition the § 911 exclusion on the payment of a foreign income tax or, at least, bar the exclusion to treaty-exempted individuals like plaintiffs—but Congress has not done so. The short of it is that Congress has been quite sensitive to the possibilities of an individual's avoiding tax both here and abroad, but though it has taken other steps it has not seen fit to except those in plaintiffs' class. It has not put them on a par with federal employees (or others paid with federal money) whom it has deliberately and expressly removed from the privilege of the section. Instead, it has continued to use for our type of taxpayer the general and ordinary term "bona fide resident" which suggests, both in normal usage and as employed in § 871 (the converse provision, see note 7, *supra*), an appraisal of all pertinent factors, not a dominating test of the non-payment of the foreign tax (by treaty or otherwise). Congress may well have believed that, if such residency is shown by an all-inclusive evaluation, it would hinder, not help, American enterprise abroad to make the § 911(a) (1) exemption turn only on the single factor of subjection to the foreign tax.

Nor can we accept, in this connection, the Government's other contention that a treaty exemption is necessarily different, for § 911(a) (1), from a tax exemption by the internal law of the foreign country. There would usually be no greater difficulty in ascertaining the latter by examination of the foreign tax laws; and both are on exactly the same plane if the criterion is escape from paying both the foreign and the domestic imposts. We see no meaningful difference, and therefore consider as fully in point the decisions, cited *supra*, that payment or subjection to the foreign tax is not a precondition to invocation of the privilege of § 911(a) (1).

The Government argues, however, that precedent exists for its position that the privileges and immunities granted by the treaty preclude taxpayers, as a matter of law, from being bona fide residents. Commissioner of Internal Revenue v.

Matthew, *supra*, 335 F.2d 231 (C.A.5, 1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1024, 13 L.Ed.2d 962 (1965); Baden v. United States, 233 F.Supp. 185 (N.D. Ohio 1964); Boyd v. Commissioner, 46 T.C. 252 (1966). In *Matthew*, upon which *Baden* and *Boyd* rely, the plaintiff was employed by Pan American World Airways to work on a United States Air Force Base in the Bahamas. A treaty between Great Britain, which governed the Islands, and the United States provided the latter with sovereign power over American citizens working on the Base. Among other provisions, the treaty exempted American citizens from all Bahamian taxes, and vested judicial authority over them, while on Base, in the United States. Off the Base, the American civilians were subject to the concurrent jurisdiction of the Bahamas and the United States in all but the most minor legal situations. The Fifth Circuit observed that

> Under this basic arrangement, these civilian employees have rights and privileges which set them apart from the general community. They bear none of the usual obligations of a local resident, whether citizen or alien resident. They are exempt from all of the affirmative obligations and responsibilities of a resident citizen or alien. And as to the universal negative obligation imposed on all inhabitants not to violate established law, they are above the community and beyond the reach of its judicial power [unless the United States waives its exclusive or concurrent jurisdiction] * * * [335 F.2d at 236.]

For these reasons, the court concluded that "as a matter of law, the treaties between the two governments kept the presence of these civilian employees from ever ripening into residence." 335 F.2d at 234.

■ The Fifth Circuit did consider tax exemption as one element, but we reject defendant's assertion that the absolute principle to be derived from the holding is that tax-exemption, coupled with a grant of privilege or immunity in some minor form, automatically precludes a finding of bona fide residency. That the court did not so intend is apparent from its statement that

> Extraterritorial rights, privileges, and immunities *of the fundamental kind accorded here* keep this physical presence from ripening into actual residence in a foreign country. [335 F.2d at 236, emphasis added.]

The opinion thus made clear, we think, that it was the total effect of the specific privileges and immunities uniquely involved there that formed the basis of its holding, rather than the absolute principle of tax-exemption by treaty, as now advanced by the defendant. Moreover, it is generally assumed that a finding of residency, once the facts are established, rests upon a conclusion of law. Sochurek v. Commissioner of Internal Revenue, *supra*, 300 F.2d 34, 37 (C.A.7, 1962); Commissioner of Internal Revenue v. Swent, 155 F.2d 513, 514 (C.A.4, 1946), cert. denied, 329 U.S. 801, 67 S.Ct. 491, 91 L.Ed. 685 (1947). Thus, it is hardly surprising that the court in *Matthew* should find "as a matter of law" that, on the special facts there presented, that particular plaintiff was not a bona fide resident. This does not mean, of course, that whenever a treaty grants some privileges and immunities to aliens, including tax exemption, they could never become "residents" of that country. Two earlier cases, also involving the question of residency where a similar treaty was involved, concluded that other factors sufficiently minimized the effect of the privileges and immunities to enable those taxpayers to benefit from § 911(a) (1). Brueck v. United States, 228 F.Supp. 112 (N.D.Ind.1963); Benfer v. Commissioner, 45 T.C. 277 (1965). Both opinions emphasized that all the facts of each situation must govern on "residency"—and with that principle we agree.

II

We must, therefore, go beyond the Argentine-United Nations Treaty which

grants plaintiffs immunity from the Argentine income tax, and accords them some minor privileges under local law, and direct our inquiry to the exact nature of these privileges and immunities, as well as the additional factors supporting or denying taxpayers' claim of bona fide residency.

In Sochurek v. Commissioner of Internal Revenue, *supra*, 300 F.2d 34 (C.A.7, 1962), the Seventh Circuit conveniently enumerated the more important factors which should be considered in a determination of bona fide residency under § 911(a) (1):

(1) intention of the taxpayer;

(2) establishment of his home temporarily in the foreign country for an indefinite period;

(3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment;

(4) physical presence in the foreign country consistent with his employment;

(5) nature, extent and reasons for temporary absences from his temporary foreign home;

(6) assumption of economic burdens and payment of taxes to the foreign country;

(7) status of resident contrasted to that of transient or sojourner;

(8) treatment accorded his income tax status by his employer;

(9) marital status and residence of his family;

(10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time;

(11) good faith in making his trip abroad; whether for purpose of tax evasion. [300 F.2d at 38.]

To this list we add:

(12) nature and extent of any special considerations granted taxpayer by the foreign country which are unavailable to other residents of that country.

The trial commissioner has found that the taxpayers had the requisite intent to remain abroad to accomplish a purpose (see Treas.Reg. § 1.871–2(b), *supra* note 7), and had fully assimilated into their Argentine communities. With this finding the Government concurs and has now conceded that, absent the privileges and immunities accorded under the treaty, both Scott and Warnick would be qualified for the benefits of § 911(a) (1). Defendant no longer argues that it is necessary, to activate the statutory privilege, that the individual intend to remain overseas permanently or indefinitely. The trial commissioner correctly rejected that contention. As he said: "In and of itself, the language of § 911(a) (1) neither suggests nor permits a construction that Congress intended absolutely essential to bona fide residence abroad, that the United States citizen hold the intention to stay in the foreign country permanently or indefinitely. The cited regulation [Treas.Reg. § 1.911–1(a) (2)] does not clearly provide any such requirement. The legislative history of overall § 911, cited and discussed by defendant [see *supra*], does not establish any such extreme position by Congress.

\* \* \* \* \* \*

"No case has been cited or found \* \* holding that lack of intent to remain abroad indefinitely is in and of itself fatal to the tax exemption claimed, irrespective of all other facts and circumstances.

\* \* \* \* \* \*

"It is my opinion that it would be unreasonable to ascribe as the intent of Congress, that under no circumstances could a United States citizen establish bona fide residence abroad, for the purpose of § 911(a) (1), unless he had the intention to remain abroad permanently or indefinitely. Such a holding would verge on a ruling that the bona fide residence required is the establishment of domicile in the foreign country, and

would at least result in marked favoritism of the American itinerant in foreign lands, taking advantage of the 18-month provisions of § 911(a) (2) [see *infra*]."

With the intent to remain permanently put aside as the ruling element, it is plain, on the unchallenged findings, that both taxpayers were well integrated into their local milieus during their period in Argentina. They resided there for an uninterrupted period including one full taxable year; they immersed themselves in their local social and professional communities; they spoke the native language (at least in part), and were acquainted with and followed local customs; they labored toward a goal which could be accomplished only over an extended period of time; they were subject to the dictates of local law, with minor exceptions; they did not live or hold themselves apart on a separate American enclave; and their stay in Argentina was not prompted by a tax-avoidance motive. In addition, Dr. Warnick was accompanied by his wife and three children, who were enrolled in local schools. (Dr. Scott was divorced at the time.) As much as they could, both taxpayers formed a part of Argentine life.

█ In this setting, we hold that the privileges and immunities granted plaintiffs were not of such a fundamental nature that they over-balanced these other factors and vitiated the claims of residency. The effect of exemption from taxation we have dealt with earlier in Part I, *supra*, and need repeat only that payment of foreign income tax is not a *sine qua non* for the benefits of § 911(a) (1), Sochurek v. Commissioner of Internal Revenue, *supra*, 300 F.2d 34 (C.A. 7, 1962); Chidester v. United States, *supra*, 82 F.Supp. 322, 113 Ct.Cl. 87 (1949); White v. Hofferbert, *supra*, 88 F.Supp. 457 (D.Md.1950), even when bestowed by legislative grace on select individuals. Brueck v. United States, *supra*, 228 F.Supp. 112 (N.D.Ind.1963); Benfer v. Commissioner, *supra*, 45 T.C. 277 (1965). *Cf.* Commissioner of Internal Revenue v. Matthew, *supra*, 335 F.2d

231 (C.A.5, 1964), cert. denied, 380 U.S. 943, 85 S.Ct. 1024, 13 L.Ed.2d 962 (1965); Baden v. United States, *supra*, 233 F.Supp. 185 (N.D.Ohio 1964); Boyd v. Commissioner, *supra*, 46 T.C. 252 (1966). The position of some long-time foreign employees of international agencies in Washington shows that one can, indeed, be a resident of a local community, in the normal sense, even though one may be free of income tax there or reimbursed by one's employer for the tax. If, as in the present cases, the integration into the community is great— if one is truly a "resident" in the ordinary meaning—non-subjection to the local income tax will not throw the scale the other way.

The Government stresses, in addition, the other privileges enjoyed by plaintiffs. Most significant, to defendant, is the immunity from service of process for job-related acts and utterances, which is said to be similar to the situation in *Matthew, supra.* In that case, however, the United States retained sovereignty over the taxpayer, except for the most unimportant matters. Matthew was subject to the Uniform Code of Military Justice, and the United States had exclusive jurisdiction in cases involving all security offenses, and concurrent jurisdiction over other infractions. Commissioner of Internal Revenue v. Matthew, *supra*, 335 F.2d at 235–236. Here, plaintiffs were subject to Argentine law and could have been prosecuted by that country for all violations not connected directly with their official duties. Far from being so fundamental as to destroy a claim of residency, this latter privilege is closely analogous to the right conferred by the Constitution upon United States legislators, Art. I, § 6, which certainly does not preclude residency. Plaintiffs did not have full diplomatic immunity—a status which the treaty conferred only upon "the executive head" of the specialized agency—and were not treated as if they had. Nor did the United States (or the FAO) have general criminal or regulatory jurisdiction over

them. Argentina had almost as much control as if they worked for a domestic organization in that country.

The several factors affirmatively showing an integrated residency far outweigh, in our view, the "negative elements" of tax exemption and immunity from certain lesser aspects of local law. By assuming the burdens of daily life, assimilating into the local community, subjecting themselves to local jurisdiction, and identifying with the customs and habits of Argentina, plaintiffs became bona fide residents of that country. *Cf.* Jones v. Kyle, 190 F.2d 353, 355 (C.A.10), cert. denied, 342 U.S. 886, 72 S.Ct. 175, 96 L.Ed. 664 (1951). The

> special privileges which [they] enjoyed * * * did not isolate [them] from the foreign environment to such extent as to preclude the establishment of a bona fide residence. [Meals v. United States, *supra*, 110 F.Supp. 658, 662 (N. D.Cal.1953).]

This conclusion is unaffected by subparagraph (2) of § 911(a), not invoked here, which exempts from taxation, in the case of a United States citizen who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States, which constitute earned income attributable to services performed during the 18-month period. First, mere physical presence in the foreign country or countries is sufficient under that subparagraph. Second, there is no requirement that such physical presence be uninterrupted. As a member of the jet set, a taxpayer could qualify even though he made several trips to the United States, so long as he spent a full 510 days overseas during the 18-month period. Furthermore, he might

be an itinerant entertainer, or the like, moving from town to town, from one foreign country to another, packing and unpacking trunks and suitcases, living exclusively in hotels or boarding houses, never establishing any home life, with little, if any, participation in the community life of any foreign country. It is for these reasons that we view § 911 (a) (2)—which deals with mere physical presence abroad, rather than with "residence"—as not restricting or limiting the normal conception of "bona fide resident" which Congress used as the controlling measure in subparagraph (1) of § 911(a).

### III

The Government has one last arrow, aimed solely at Dr. Warnick. The contention is that § 911(c) (6) prevents this plaintiff from recovery, since the tax exempt status conferred by the treaty is equivalent to a "statement" made by taxpayer that he is a non-resident for tax purposes.[9] As we see it, however, this is a harmless arrow.

As indicated above, Congress was fully aware that certain individuals were able to escape all income tax liability when staying abroad. *See,* Report of the House Ways & Means Committee on H.R. 6426, H.Rep.No.894, 83rd Cong., 1st Sess. (July 21, 1953) pp. 4–5. But rather than deny the benefit of § 911(a) (1) to all those not required to pay foreign income tax, Congress excluded only certain individuals. The objects of Congressional disfavor (aside from persons paid by the United States or its agencies) were those who denied foreign residency in a foreign country to avoid income taxes levied by that government, and then claimed residency abroad, before our Internal Revenue Service, for the purposes of §

9. § 911(c) (6) was enacted in 1962, and hence is inapplicable to Dr. Scott, who lived in Argentina in 1961.

> Subsection (c) (6) provides:
> "*Test of bona fide residence.*—A statement by an individual who has earned income from sources within a foreign country to the authorities of that country

> that he is not a resident of that country, if he is held not subject as a resident of that country to the income tax of that country by its authorities with respect to such earnings, shall be conclusive evidence with respect to such earnings that he is not a bona fide resident of that country for purposes of subsection (a) (1)."

911(a) (1). *See, e. g.* Weible v. United States, *supra*, 244 F.2d 158 (C.A.9, 1957). The Senate, in its report on § 911(c) (6), clearly stated

> This is intended to prevent an individual from avoiding income tax in the United States and the foreign country by taking inconsistent positions with respect to residence in the two countries. * * *

> It * * * does not deny an individual an exclusion as a bona fide resident if, under wholly consistent positions with respect to residence in the United States and a foreign country, he is held by both countries to be a nonresident. [S.Rep.No.1881, 87th Cong., 2nd Sess. (1962), 1962–2 U.S. C.C.A.N. pp. 3378–80.]

While neither the United States nor Argentina regarded Warnick as a non-resident, it is obvious that the Senate intended § 911(c) (6) to apply only to those individuals who affirmatively acted in the manner prescribed to prevent collection of a tax imposed by the foreign government. The measure was designed to prevent a taxpayer from wrongfully taking advantage of his own acts, and not to bar him from enjoying a benefit conferred upon him, without his affirming his nonresidency, by the government of his temporary place of residence.

The Government cites two Revenue Rulings holding that a tax-exemption under a treaty is equivalent to a "statement":

> In the instant case, the status of being exempt from the income tax of the foreign country as a nonresident of the foreign country under the Multilateral-Mutual Defense Assistance In Indochina Agreement is considered to be the equivalent of the "statement" referred to in section 911(c) (6) of the [Internal Revenue] Code. [Rev.Rul. 69–449, 1969–2 Cum.Bull. 155; *see also* Rev.Rul. 68–553, 1968–2 Cum.Bull. 311.]

■■ Because, as pointed out above and in Part I of this opinion, Congress specifically and unequivocally excluded only those who actually made individual statements of non-residence to the foreign government, we reject these rulings. On the contrary, we hold that § 911(c) (6) is applicable only to those individuals who affirmatively state to the foreign government that they are not residents for tax purposes, and thereby escape taxation. Since Dr. Warnick made no statement of any kind to the Argentine government that he was not a resident, § 911(c) (6) is not applicable to him.

Both plaintiffs have properly invoked § 911(a) (1) and are therefore entitled to refunds. Judgment is entered to that effect, and the amount of recovery will be determined under Rule 131(c).

NICHOLS, Judge (dissenting):

As Judge Davis points out, a regulation of long standing, Treas.Reg. § 1.-871–2(b) purports to define when an alien present in the United States is a "resident" under our income tax laws, and Reg. § 1.911–2(a) (2) incorporates it "to the extent feasible" by reference in the determination of what American citizens are bona fide foreign residents under § 911.

Under Reg. § 1.871–2(b) one who comes to the United States for a definite purpose, which "may be promptly accomplished", is a "transient", but if "an extended stay" is necessary to accomplish his purpose he may become a resident even if he always intends to return home when his purpose is achieved. The meaning of this, as applicable here, depends on how one reads "promptly" and "extended" and these words do not of themselves, answer our problem without ambiguity. But the regulation continues:

> An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section in the absence of special circumstances.

I read this as referring to the various classes of nonimmigrants enumerated in

8 U.S.C. § 1101(a) (15), among whom are alien officers or employees of international organizations and members of their immediate families, by subsec. (G) (IV). When such a person's accreditation ends, the legality of his stay in the United States ends also. Menon. v. Esperdy, 248 F.Supp. 261 (D.C.1965), affd. 413 F.2d 644 (2d Cir., 1969). By § 1184 nonimmigrants are admitted for such times as the Attorney General may by regulation prescribe. Without analyzing the situation in further detail I doubt if under the quoted line of Reg. § 1.871–2 (b) an alien employee of an international organization, during his accreditation, would be a "resident" here in the eyes of our income tax laws. (Of course his pay is exempt anyway under IRC of 1954 § 893). Also I doubt whether a United States citizen is properly treated as a resident of a foreign country for purposes of our income tax laws, when a foreign citizen sojourning in this country, is not treated as one of its residents, under like or similar circumstances. The clear intention is to treat the cases alike, and any failure to do so is an anomaly that requires an explanation which is not forthcoming here. What are the "special circumstances" that remove this case from the general rule, or why is it not "feasible" to apply it?

It is also significant, I think, that under § 1.871–4(b) it is presumed that an alien in the United States is a nonresident. It should likewise be presumed that a United States citizen sojourning in a foreign country is a nonresident of that country. § 911, applicable here, requires taxpayers claiming exemption under it to prove bona fide residence abroad "to the satisfaction of the Secretary." It seems to me these provisions, taken together, add up to a more than normal burden on taxpayers to show the deficiencies assessed to be illegal because of their bona fide residence in Argentina. I do not think they have sustained the burden here.

I would dismiss both petitions.